Thomas W. McNamara
tmcnamara@mcnamarallp.com
501 West Broadway, Suite 2020
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Court-Appointed Receiver*

Daniel M. Benjamin (SBN 209240)
dbenjamin@mcnamarallp.com
Andrew W. Robertson (SBN 62541)
arobertson@mcnamarallp.com
McNamara Benjamin LLP
501 West Broadway, Suite 2020
San Diego, California 92101
Telephone: 619-269-0400
Facsimile:  619-269-0401

*Attorneys for Receiver*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                Plaintiff,<br><br>        v.<br><br>DAMIAN KUTZNER, et al.,<br><br>                Defendants. | Case No. LACV16-00999 BRO (AFMx)<br><br>**PRELIMINARY REPORT OF TEMPORARY RECEIVER**<br><br>JUDGE:   Hon. Beverly Reid O'Connell<br>CTRM:    14 |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................1
II. RECEIVERSHIP ACTIVITIES ....................................................................2
    A.    Defendants' Sites ................................................................................2
    B.    Bank Accounts ...................................................................................4
    C.    Documents/Information/Electronic Data .........................................4
    D.    Cooperation of Individual Defendants ..............................................5
III. SUMMARY OF OPERATIONS ...................................................................7
    A.    Marketing and Solicitation ................................................................7
    B.    Mass Joinder Cases ..........................................................................11
    C.    Other Business ..................................................................................12
    D.    Who's in Charge?..............................................................................12
            1.    Damian Kutzner ...................................................................13
            2.    Jeremy Foti ..........................................................................14
            3.    Vito Torchia, Jr. ..................................................................16
            4.    Charles Marshall ..................................................................18
            5.    Geoffrey Broderick ..............................................................18
            6.    Jonathan Tarkowski .............................................................19
IV. FINANCIAL INFORMATION ..................................................................21
V. CAN THE BUSINESSES BE OPERATED  LAWFULLY AND
    PROFITABLY?..............................................................................................22

# PRELIMINARY REPORT OF RECEIVER

## I.

## INTRODUCTION

On June 1, 2016, this Court entered an *Ex Parte* Temporary Restraining Order with Asset Freeze, Appointment of Temporary Receiver ("TRO") that appointed me Temporary Receiver of the Receivership Entities, defined at page 8 of the TRO as the Corporate Defendants (Advantis Law P.C., Advantis Law Group P.C., Brookstone Law P.C. (California), Brookstone Law P.C. (Nevada)) and any entities that are part of Defendants' common enterprise, including but not limited to Broad Base Inc. and Federal Management Systems Inc.

I submit this Preliminary Report in compliance with Section XVII of the TRO which directs that I report on the following topics prior to the Preliminary Injunction hearing:

1. <u>Steps taken to implement the TRO</u>:  I have indefinitely suspended Receivership Entities' operations.  The unlawful practices prohibited by the TRO are ingrained in their operations.  Further, their current revenues are residuals from clients previously secured through the unlawful practices.  *See* Section II(F) *infra*.

2-3. <u>Receivership Entities' assets and liabilities</u>:  The Receivership Entities have no meaningful assets other than the nominal balances in bank accounts as set forth in Section II(B) below.  We cannot yet estimate liabilities.

4. <u>Steps Receiver intends to take to protect assets of the Receivership Entities, pursue assets from third parties, and adjust liabilities</u>:  The asset freeze and receivership control of the business property are the primary immediate vehicles to protect assets in this case.  Whether third parties have assets that can be claimed by the Receivership and whether liabilities can be adjusted are matters that will require further investigation.  At this juncture, however, we are not optimistic about the prospects for these recoveries.

///

5.    <u>Any other matters which the Receiver believes should be brought to the Court's attention</u>:  These matters are set forth below.

**II.**

**RECEIVERSHIP ACTIVITIES**

**A.    Defendants' Sites**

As directed and authorized by Section XV(B) of the TRO, we took possession of the known offices of the Receivership Entities at 6 Hutton Centre Drive, Suite 1000, Santa Ana, California the morning after the Court entered the TRO, June 2, 2016, beginning at 10:45 a.m.  The office is spacious at nearly 7,000 square feet and well-appointed with nine external offices and four cubicle pods (two to three work spaces per pod).

The identified tenant is Advantis Law Group P.C. under a sublease at $10,473 per month that delivered the space fully furnished and equipped, although Defendants appear to have added multiple large flat screen televisions throughout. It appeared, however, that less than half the space was currently utilized by Advantis and other Receivership Entities.  Attached as Exhibit 1 is a schematic of the office and inventory of furniture and equipment.

A total of seven Advantis/Brookstone personnel were initially present – Defendant Damian Kutzner (who, after receiving a copy of the TRO, refused to identify himself and slinked out quickly), Defendant Geoffrey Broderick, a receptionist, a legal intern, an associate attorney, and two intake operatives.  All cooperated and completed questionnaires, except Mr. Kutzner, who left immediately after being handed a copy of the TRO – *see* Section D below. Defendants Vito Torchia, Jr., and Jonathan Tarkowski arrived later in the day.

The premises were secured and a locksmith changed the locks.  Forensic computer experts began their work as described below, and members of the

///

///

Temporary Receiver team commenced review of the documents and records onsite.[1]

On Friday, June 3, we provided supervised access to the site to attorneys from the Federal Trade Commission ("FTC").

While on site, we located a sublease agreement indicating that Broad Base Inc., a Kutzner entity identified in the TRO as a common enterprise company, was leasing space at 660 West Baker Street, Suite 317 in Costa Mesa, just a few miles from the 6 Hutton Centre Drive site. We confirmed that this is a small (approximately 1,000 sq. ft.) medical marijuana operation in the name of Cancer Treatment Collective, which subleases the space from Broad Base Inc. Both the lease and the sublease were executed for Broad Base by one Chase Bain, which we believe is a cover name for Mr. Kutzner. We placed the owner of the building on notice that Broad Base was subject to the Receivership. We also found Cancer Treatment Collective release forms at the Advantis receptionist desk at 6 Hutton Centre Drive, suggesting Kutzner's ownership and participation in the marijuana business. We visited the Cancer Treatment Collective location on Friday morning, but the receptionist reported that her managers were not present and she would not provide their names. We left a business card and asked for a manager to contact us, but have heard nothing.

///

---

[1] At the outset, we also encountered a group of seven employees from OGI Mortgage. The OGI employees were just beginning their first full day of OGI's as-yet-unsigned sublease with Advantis for approximately half of the office space. The OGI representative reported that OGI was in the very preliminary stages of a marketing arrangement with Jeremy Foti (who, though not a named defendant turned out to be, as described more fully below, one of the principals of the Receivership Entities) to generate residential mortgage origination business for OGI. The draft sublease identified "Advantis Marketing Group" as the sublessor. After confirming the lack of connection to the mass joinder business, the OGI personnel were permitted to leave, and they were allowed to remove their computers from the premises the following morning, after it was confirmed the computers contained no Receivership Entity data.

## B.     Bank Accounts

Beginning June 2, 2016, we served the TRO/Asset Freeze on banks and other financial institutions where Defendants were known to have accounts or credit card merchant accounts.  The following accounts have been frozen:

| Account | Bank | Acct. No. Ending | Balance Frozen |
|---------|------|------------------|----------------|
| Advantis Law P.C. | US Bank | 6379 | $9.12 |
| Advantis Law P.C. | US Bank | 6387 | $1.00 |
| Advantis Law Group P.C. IOLTA | US Bank | 7539 | $5.00 |
| Advantis Law Group P.C. | US Bank | 7547 | $5.98 |
| Brookstone Law P.C. | Bank of America | 5293 | $76.02 |
| Brookstone Law P.C. | Bank of America | 7366 | $12,626.15 |
| Brookstone Law P.C. | Citibank | 3068 | $78.21 |
| Brookstone Law P.C. | Citibank | 7333 | $318.28 |
| Brookstone Law P.C. | US Bank | 2507 | $10.00 |
| Charles T. Marshall, Attorney at Law | Citibank | 6263 | $20.00 |
| Charles T. Marshall, Attorney at Law, Business Checking | JPMC | 4691 | $49,017.79 |
| Charles T. Marshall, Attorney at Law (IOLTA) | JPMC | 2107 | $25.69 |
| Broad Base, Inc. dba Serious Pimp | JPMC | 3379 | $6,388.42 |
| **TOTAL** | | | $68,581.66 |

Other than nominal funds in these accounts, Receivership Entities do not appear to have any available assets.

## C.     Documents/Information/Electronic Data

Upon taking possession of the premises, we confirmed that all hard copy documents were secure.  A computer forensic team I retained made images of designated servers, desktop computers, laptop computers, and the smartphones of

Defendants Torchia, Broderick, and Tarkowski.  (As noted above, Kutzner refused to identify himself and left immediately upon being given a copy of the TRO, so we were unable to copy his smartphone.)  In this process, all available electronic data relating to Receivership Entities' operation was secured.  We commenced the review of this information in order to reconstruct the operational and financial picture.

### D.   Cooperation of Individual Defendants

Defendant Damian Kutzner has been overtly uncooperative and obstructionist.  Upon our initial arrival, I proceeded to the largest corner office where I encountered who I now know to be Damian Kutzner.  I handed Mr. Kutzner a copy of the TRO, explained my role as Temporary Receiver, and told him that the TRO included an asset freeze.  He refused to identify himself, but walked me to Defendant Geoffrey Broderick.  I presented the TRO to Broderick, explained the situation and asked for Broderick's assistance in gathering the employees (which he did).

In the hub of activity and during my conversation with Defendant Broderick, Kutzner snuck out of the office.  Realizing that Defendant Kutzner had left, I asked Defendant Broderick to call Kutzner's cell phone.  This occurred at about 11:00 a.m., less than 15 minutes after entering the office.  Kutzner did not answer so I left a voicemail on his cell phone, reiterating that he was subject to the asset freeze and should take no steps to violate the TRO.  Defendant Kutzner never returned to the office and has made no effort since to contact me or my staff.[2] Notably, Kutzner scampered out in such a hurry that he left his keys on his desk, including the key to his brand new Dodge pickup truck parked at the reserved spot

---

[2] I called Kutzner's cell phone number more than once afterwards but never got an answer.  I do have reason to believe that Kutzner received my voicemail and later calls.  The FTC attorneys asked me for Kutzner's cell phone number.  They later reported to me that an attorney purporting to represent Kutzner called them and asked that no further calls be made to Kutzner's cell, as he did not intend to talk with anyone.

for "Damian" in the building parking lot.  The truck remained parked in that spot until the next morning when we believe it was removed by a Brookstone employee.

Late on Friday, June 3, 2016, we brought in a Brookstone employee to walk us through an internal database called Integrated Legal System ("ILS").  The employee was not, however, able to access ILS, which is hosted on a local server.  After a number of efforts to locate and activate ILS on the system, we spoke with Brookstone's IT consultant, Tudor Cora.  We learned from Cora that Kutzner had directed the server hosting ILS be shut off – only hours after Kutzner had been handed the TRO and received the voicemail message regarding the TRO.

Cora later provided a text message chain between him and Kutzner.  (*See* Exhibit 2.)  Those messages show that Kutzner began asking that the system be shut down at 1:55 p.m. on Thursday, June 2 – three hours from the time we entered the office – by falsely claiming they were switching accounts and needed the system shut down.  When the system was still operational at 5 p.m., Kutzner pleaded it be shut down: "Guys cmon Pleeeeasee shut off ILS!!!!!!!"  Cora turned the system off shortly afterwards.

After ferreting out all the above, we were, with the help of our computer forensics staff, able to reactivate the system late Friday.  Defendant Kutzner's actions, in light of the personal notice of the TRO, are in direct violation of the TRO and contempt of this Court's order.

Defendant Geoffrey Broderick was present at our arrival, agreed to be interviewed and has been cooperative, but not always credible.  Defendants Vito Torchia and Jonathan Tarkowski were not present at the outset, but arrived within an hour or two of our arrival – both made themselves available for extended interviews and were generally cooperative, although I did not find Torchia totally credible.  Defendant Charles Marshall was not present and has not yet met with us. ///

1   I did speak with him briefly, but we have had no contact since he advised he was

2   seeking counsel.

### III.

### SUMMARY OF OPERATIONS

5       The Advantis/Brookstone business we found in Suite 1000 were the

6   surviving components of a bigger "mass joinder" operation.  We were told that in

7   the heyday of the business, around 2011-2013, there were 40-50 people.  While we

8   found evidence of ongoing direct mail solicitations for mass joinder plaintiffs, the

9   scale was much reduced.  The ongoing business appeared to be comprised mostly

10   of the management of previously-filed mass joinder cases and/or their

11   transformation to trustee cases, financed primarily by residual payments from

12   clients, as detailed below.

13       **A.       Marketing and Solicitation**

14       We found evidence of sales materials, new and old, with false promises,

15   strong arm tactics, and advance fees, seeking to recruit and/or retain mass joinder

16   plaintiffs:

17       •   In 2015, Brookstone sent mailers to consumers "to discuss [their]

18           landmark victory against Bank of America in California."  The mailer

19           targeted consumers with upcoming trustee sale dates (non-judicial

20           foreclosure dates), included the specific date, and urged consumers to

21           call to be included in a case against the trustee.  The mailer also

22           provided an "update" on Bank of America's $16 billion dollar

23           settlement with governmental authorities and stated consumers may

24           accept settlement funds and sue the trustee.  (Exhibit 3.)

25       •   In 2016, Advantis sent mailers entitled "PENDING LEGAL

26           NOTICE" to consumers contending that he or she has been identified

27           as a potential plaintiff.  The mailer included the consumer's property

28   ///

address and loan amount and urged consumers to "call today before you lose your rights."  (Exhibit 4.)

- After the Advantis "PENDING LEGAL NOTICE" mailers failed to generate sufficient response, Kutzner directed the direct marketing company to prepare a similar mailer based on the Brookstone trustee mailer.  Kutzner's email noted that the "[o]ther mailers isn't [sic] getting the numbers we had with the trustee mailer."  (Exhibit 5.) Advantis later sent trustee mailers that were similar to the Brookstone trustee mailers, but with the Advantis logo.  (Exhibit 6.)

- We located scripts for both Brookstone and Advantis, which guided the intake employees on how to respond to consumers calling in response to the mailers:

  o Brookstone Law Main Floor Script (Inbound) – The script includes various misleading statements including "all of our landmark cases are still going through the court system."  After reviewing certain questions with the consumers, the intake employee schedules an in office appointment or a phone appointment.  The script notes that phone appointments "close at a smaller percentage in comparison to in office appointments. If a client is within our service area and refuses to come in to save their home then do not waste the Banking Specialists time or the attorney's time.  If someone wants to save their home then make them get off the couch and drive in here." (Exhibit 7.)

  o Advantis Law Main Floor Script (Inbound) – This script contains the same misleading statements as the Brookstone Law Main Floor Script.  (Exhibit 8.)

///

o     Objection Techniques – In preparation for potential objections by consumers, Brookstone scripted responses designed to convince consumers to schedule an appointment.  (Exhibit 9.)

o     Follow Up Guidelines – After the consumer's appointment, intake employees called the consumer to follow up and convince him or her to join the lawsuit.  Intake employees were directed to "inform [consumers] that the banks are in accelerated talks with the federal government in regards to seeking immunity from any further civil litigation suits moving forward.  If this happens and you are not protected by our lawsuit, you will be at the mercy of what the banks want to do with your loan."  (Exhibit 10.)

o     Accounting Inbound Script – When consumers called regarding an "Accounting Hold" placed on their account, the intake employees collected information to reorganize the *Wright v. Bank of America* plaintiffs and scheduled an appointment for the accounting department to discuss the status of the consumer's payment.  (Exhibit 11.)

o     Scripts were also prepared in Spanish (Exhibit 12.)

• After the Superior Court dismissed the *Wright v. Bank of America* complaint in January 2013, Brookstone dispatched a letter to the plaintiffs warning them that the statute of limitations was running out and offered these plaintiffs the option to join the appeal or pursue an individual case.  In doing so, Brookstone also touted the ultimate merits of the mass joinder strategy.  (Exhibit 13.)

• After the Court of Appeal decision in the *Wright* case in December 2014 (reversing the dismissal below on the ground that the joinder of 800 plaintiffs was procedurally possible), Brookstone pivoted to a

new strong arm tactic.  Brookstone sent "Account Due" statements to the *Wright* plaintiffs to remit another $5,000 to get off "Accounting Hold" so Brookstone "can continue to represent you as a plaintiff on this case."  These Account Due statements included preposterous time allocation for previous work (e.g., 1,237 hours to prepare the opening brief, 175 hours for the responding brief, and 453 hours for the reply brief).  (Exhibit 14.)  We found boxes of the Account Due letters, some ready to be mailed and some having been returned due to a bad address.

- Many consumers responded to these Account Due statements saying they were shocked to find out that they had an "overdue" balance after making regular payments.  (Exhibit 15.)

- Several of these consumer complaints were circulated internally by Jeffrey Foti and/or Damian Kutzner, who directed other employees to follow up.  (Exhibit 16.)

- While the numbers varied somewhat over time, the standard Brookstone/Advantis pricing to consumers was $895 or $1,250 for the initial legal analysis and $3,000 or $4,500 for the litigation and monthly fees.  The monthly fees varied from $250 per month for the first year and $60 per month for the subsequent months or $650 per month in the most recent agreements.  The retainer agreements that we found on site reflected this range of fees and onerous provisions:

  o Brookstone Law Legal Analysis Attorney/Client Fee Agreement - $1,250 "up-front, fully earned one-time fee" (Exhibit 17).

  o Advantis Law Group/Brookstone Law Legal Analysis Attorney/Client Fee Agreement - $1,250 "up-front, fully earned one-time fee" (Exhibit 18).

○ Brookstone Law Attorney-Client Contingency Fee Agreement - $3,000 "fully earned, non-refundable fee," $150 monthly legal fee, and 35% of the "gross recovery (Exhibit 19).

○ Advantis Law Group Attorney-Client Contingency Fee Agreement – $4,500 "initial fully earned, non-refundable retainer fee," $650 monthly legal fee, and 35% of the "gross recovery" (Exhibit 20).

**B.** **Mass Joinder Cases**

Except for a very few minor matters related to Kutzner's other business and personal matters, the only substantive legal practice being conducted here is the management of mass joinder cases and their spinoff trustee cases. We identified the following active cases:

- *Montes, et al. v. Wells Fargo Bank*, California Superior Court, County of Los Angeles, Case No. BC556821.

- *Randall, et al. v. Citigroup Inc., et al.*, California Superior Court, County of Los Angeles, Case No. 526888.

- *Lawley, et al. v. Bank of America, et al.*, California Superior Court, County of San Diego, Case No. 37-2016-00011715-CU-OR-CTL.

- *Bradford* case (dismissed for misjoinder, but reinstated because almost identical to *Wright*, removed to federal court) – First of 4 is Lawley (B of A response to complaint). Response due June 15, wants 30 day extension.

- *Wright, et al. v. Bank of America, et al.*, California Superior Court, County of Orange, Case No. 30-2011-00449059-CU-MT-CXC.

- *Aslami v. National Default Servicing Corp., et al.*, California Superior Court, County of Orange, Case No. 30-2016-00844390-CU-OR-CJC.

///

///

- *Curtis, et al. v. MTC Financial, et al.* (extension to Chase), California Superior Court, County of Orange, Case No. 30-2016-00841019-CU-OR-CJC.
- *Salgado, et al. v. Western Progressive LLC, et al.*, California Superior Court, County of Orange, Case No. 30-2016-00854281-CU-OR-CJC.
- *Wasniak, et al. v. Quality Loan Service Corp., et al.*, California Superior Court, County of Riverside, Case No. RIC1601230.
- *Chan Lee v. JP Morgan Chase Bank, et al.*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:15-cv-05215-RMW.

We estimate that, in the aggregate, these cases include approximately 1,300 plaintiffs purportedly represented by Advantis/Brookstone.

It did appear that some plaintiffs whose homes were lost to foreclosure were moved into cases against the foreclosure trustees.

**C.   Other Business**

We saw limited evidence of preliminary efforts to move into other areas of law (immigration, environmental, personal injury, and criminal), but we could identify no paying clients.  Damian Kutzner and Jeremy Foti also appeared to operate various other ventures.

**D.   Who's in Charge?**

The current iteration of the Advantis/Brookstone operation reflects an evolution over time, 2010–present, with different players having different roles. Many things changed – office size, office location, "law firm" name, staff levels, attorneys, and bank relationships.  But, the business remained the same – unlawful solicitation for mass joinder plaintiffs – and the primary drivers of the business, non-lawyers Damian Kutzner and Jeremy Foti, continued to drive the bus.

///

///

### 1.   Damian Kutzner

Due to his complete lack of cooperation, we do not have Kutzner's version of his role in the business.  But, documents and emails recovered onsite confirm his role as the non-lawyer quarterback who, in close collaboration with Jeremy Foti, concealed his ownership and control through the various "managing attorneys," many of whom ended up disciplined or disbarred by the State Bar:

- Employment Agreements in 2010 and 2011 (Exhibit 21) identified Kutzner as "Chief Operations Manager" and later as "Real Estate Industry Consultant" with a salary of $350,000 and assorted fringe benefits.

- Until mid-2015, the signature line in Kutzner's emails identified him as COO.  Afterwards, he stopped including a title.  We also found Kutzner's various business cards, including Campaign Manager of Vote Managers, COO of MultiMedRx, Business Development of Newport Criminal Defense.  (Exhibit 22.)

- Like Foti, he had an email account at Brookstone which was included in the office Directory on our arrival.  (Earlier directories identified him as "Management" and "COO."  (Exhibit 23.)

- He regularly reviewed and approved scripts.  (Exhibit 24.)

- By an email of March 4, 2016 to Jeremy Foti, he laid out his plan to restart the emergency postponement of trustee sales portion of the business.  Previously, in 2011, Brookstone offered trustee sale postponement services and charged consumers $2,500 for the initial payment, which included the first postponement, and $250 for each subsequent postponement.  (Exhibit 25.)

- He often circulated emails that assigned tasks and made executive decisions about the business.  (Exhibit 26.)

///

- When the internal bookkeeper circulated "Daily Cash Position Reports" they went to Kutzner, Foti, and Torchia.  (Exhibit 27.)

- For most of the period 2010-2014, Kutzner, Foti, and Torchia received equal monthly draws of approximately $11,000, with payments to Foti and Kutzner directed to their controlled entities (DND Consulting for Foti; Doheny Development Corporation for Kutzner).  A monthly compensation report from June, 2011 confirms these salaries.  It also identifies both Kutzner and Foti as "Executive." (Exhibit 28.)

- When Brookstone started cutting salaries in 2015, which included cutting in half the monthly salary of "Managing Attorney" Defendant Geoffrey Broderick, from $5,000 to $2,500, it was Kutzner and Foti who made the cuts.  (Exhibit 29.)  Defendant Broderick did not appear to have any role in this "law firm" decision.

### 2.    Jeremy Foti

Mr. Foti is a key, but elusive, player in the Advantis/Brookstone universe. He operates from a large, and upon our arrival locked, office next to Mr. Kutzner's office.  Although he has adroitly avoided any formal ownership of the Advantis or Brookstone entities, we saw ample confirmation that he was indeed one of the bosses:

- In October, 2011, Foti joined Kutzner and Torchia in signing a one-page "Deal Memo" as to Brookstone's hiring of a senior attorney to work with Torchia as a prelude to securing a $50,000 business loan. That Deal Memo confirms the reality that the non-lawyers were decision makers – it recites that there will be a majority rule in the voting decisions amongst the shareholders of the firm and the non-attorneys (Employees) Jeremy Foti and Damian Kutzner. (Exhibit 30.)

- Foti maintained an on-going email account at Brookstone (Jfoti@brookstone law) which was included in the Office Directory at reception on our arrival.  He was also included in earlier iterations of the Directory – 2014, he was classified as "Management" along with Kutzner.  An earlier Directory identified him as VP of Marketing. (Exhibit 23.)

- The part-time bookkeeper explained that Foti was in charge of calculating bonuses.  He would provide her the bonus numbers, then she would generate an Invoice from Financial Management Systems, a Kutzner entity, to Brookstone and when Brookstone funded the FMS account, she would issue checks accordingly.  The bookkeeper also reported that when decisions had to be made, she consulted "all three" (Kutzner, Foti, Torchia).

- We found on his desk a copy of the register from Brookstone's Bank of America account for May, 2016 with handwritten calculations indicating that Foti and Kutzner were splitting profits.  (Exhibit 31.)

- Foti had on his desk a large box of unopened Chargeback Statements to Brookstone from Bank of America Merchant Services. (Exhibit 32.)

- Based on his email traffic, Foti was calling and running meetings about the future of the business.  (Exhibit 33.)

- Apparently, he was not too proud of his Brookstone connection. In developing a personal marketing piece in February 2011, he declined to identify his title at Brookstone and he suggested it be omitted from his biography – "I would not mention Brookstone.  I would keep it limited to business development that currently is consulting for multiple law firms that is [sic] taking action against predatory lending."  (Exhibit 34.)

- When Defendant Geoffrey Broderick wanted a commission bonus for his efforts collecting from clients, he emailed Foti.  (Exhibit 35.)
- Foti communicated with staff about collection efforts.  (Exhibit 36.)
- Foti communicated with Kutzner and vendors on the content of mailers.  (Exhibit 37.)
- Foti and Kutzner often argued via email about each other's responsibilities and criticized each other openly about the inequity of work efforts.  (Exhibit 38.)

Mr. Foti was not present at our arrival.  His first contact with the Receiver's office did not occur until June 7, 2016 when he called our offices.  In that call, he falsely claimed to be a member of the OGI sublease group which had just moved in.  He inquired about rent going forward and requested access to the office to retrieve personal items.  As we knew that Mr. Foti was one of the principals of the illegal Advantis/Brookstone operations, we quickly confronted him.  He then dissembled, softened his claim and deflected questions.  In a subsequent call, he modified his approach but was just as dishonest.  He claimed he did have a relationship with OGI, but acknowledged that he has had an office at Advantis/Brookstone for two years.  We advised Mr. Foti that his revised story still was not credible, but he made no effort to correct it.

### 3. Vito Torchia, Jr.

We met with Vito Torchia on Thursday, June 2, when he arrived shortly after we entered the 6 Hutton Centre Drive offices.[3]  We spoke at length with Torchia on Thursday and then again briefly on Friday.  He was cooperative and helpful, though at times we did not find some statements credible.

Torchia admitted to profound alcohol problems.  He was disbarred in late May 2016, which he claims was largely the result of his alcoholism.  He claims he

---

[3] Notably, Defendant Kutzner called Torchia just as he entered the offices. When Kutzner learned that Torchia was on site, Kutzner hung up.

became completely disabled in May of 2015 as a result of a long binge which ended with his hospitalization. He claims he has been sober since.

In the first hour of our conversation, Torchia explained that he was in the midst of drafting a lawsuit against Defendants Kutzner, Foti, and Broderick and many others. The gravamen of his claim is that Kutzner and Foti deceptively froze him out of the Brookstone income stream beginning in the fall of 2014 – Torchia went to great lengths and substantial detail about the wrongs allegedly inflicted. He included Broderick, but portrayed him as a puppet of Kutzner. Despite this falling out with Kutzner and Foti, Torchia nonetheless continued to come to the office, health permitting.

When were able to get him to focus on the issues raised by the FTC complaint, Torchia was less gregarious and more defensive. Torchia acknowledged Kutzner's and Foti's significant roles, but claimed it was appropriate that since they were involved in the business of the law firm and not the practice of law. Torchia was unapologetic about the merits of mass joinder litigation. He claimed Brookstone secured the opinion of ethics counsel and the mailers they used to solicit clients were blessed by the State Bar.

Torchia's role at Brookstone/Advantis ran somewhat parallel to the progress of the business. From 2010-2014, he was the titular President and Managing Attorney with 100% of the stock and Foti and Kutzner (who joined in January 2011 and March 2011, respectively) were the de facto business operators. As the business declined so did Torchia: most of his shares were diluted and/or transferred to other attorneys (Geoffrey Broderick, Charles Marshall, John Mortimer, and ultimately Jonathan Tarkowski) and he was given a token interest in Advantis (Exhibit 39); he experienced escalating problems with the State Bar resulting in disbarment in May, 2016; he was moved from his big corner office to a cubicle in the back; his compensation shrank; and Kutzner and Foti froze him out and withheld financial information.

Torchia has never tried a case or taken a deposition.  He has argued motions. He readily admitted that he did not have the expertise or background to lead the mass joinder cases as counsel, but claimed they brought in other competent counsel to assist in the prosecution of the cases.

### 4.   Charles Marshall

Marshall is a San Diego-based attorney who, along with Geoffrey Broderick, was one of the two "Initial Partners" (each with 15%) of Advantis Law Group, formed in February, 2015 (Exhibit 40).  Given our inability to interview him, we do not otherwise have a clear picture of his role and involvement other than as another attorney recruited to replace Torchia.

### 5.   Geoffrey Broderick

Broderick is a licensed attorney in Connecticut and D.C.  He is not licensed in California.  He admitted to past legal troubles in regard to a mass joinder operation he was previously with in Florida, which was sued by regulatory authorities.  But, Broderick blamed those troubles on his former associates in that business.

He was recruited to Brookstone by Kutzner in 2015 and was awarded a percentage interest in the law firm (6%, which later increased to 45%) transferred out of Torchia's interest (Exhibit 39).  He was later identified as one of the initial partners of Advantis, along with Charles Marshall (Exhibit 40).  In his interview with us, he depicted himself as a glorified office manager with purely administrative duties at Advantis, which excluded actual operations, the practice of law, or any real estate litigation.  He stated his only legal activities were in trying, unsuccessfully, to start practice areas in other non-real estate areas of law, as well as limited actions regarding Kutzner's other businesses.

Our initial investigation indicated that Broderick worked with Kutzner and Foti to control the overall "law firm" operation in the last year.  Kutzner and Foti held the real power, but Broderick appeared to operate as their lawyer in obtaining

lawyers for the business and overseeing the legal operations. It appears that the bulk of his time as "Managing Attorney" was devoted to client collections. (Exhibit 41.)

Broderick was making some effort to expand the practice to other areas, including personal injury, and sought the approval of Kutzner and Foti to his efforts with internal emails directed to and/or copied to Kutzner and/or Foti. (Exhibit 42.)

### 6. Jonathan Tarkowski

Tarkowski is just two years out of law school. We found him to be the most credible of the Defendants interviewed. He initially worked for a "lemon law" law firm, but was laid off in late 2014. He joined Advantis as an unpaid intern in Spring of 2015 after he answered a Craigslist add. He was interviewed by Kutzner, Foti, and Broderick and was told he would have the opportunity to earn full-time employment after several months.

Broderick was his initial onsite legal supervisor, but it was clear Kutzner and Foti held the real power. He had no contact with Torchia and some phone contact with Marshall, who was not onsite. Broderick apparently knew little about the practice of law and therefor was not a resource. Tarkowski did later secure some assistance with the hiring of an associate attorney.

Around a month after he started, Tarkowski was approached by Kutzner, Foti, and Broderick, who told him that Torchia had been suspended, and offered him the managing attorney position, which he accepted. His pay was bi-weekly, and within a few months reached the equivalent of $48,000 per year. He was also offered a small ownership interest, but claims that was never finalized.

Between the summer of 2015 and our entry, Tarkowski appeared to have two primary tasks: (i) revive a number of Brookstone's mass joinder cases, including the *Wright* case and several matters that had been dismissed when
///

Torchia failed to attend hearings; and (ii) initiate new trustee lawsuits, consistent with a new business model.

Tarkowski reported, and the legal assistant confirmed, that many Brookstone clients had not been contacted by the firm in years and nearly all of the firm's cases were in a state of severe neglect. When clients came in, they met solely with non-attorneys, and there was no compliance or other scheme in place to ensure that representations were lawful. Over a period of six months, it appears that Tarkowski was able to reinstate several cases, improve the internal process by meeting with clients, and secure the termination of two sales people who were repeatedly misleading consumers.

We did see evidence that Tarkowski was well aware of the most common prohibitions relevant to the practice and made an effort to highlight these to the staff, including Kutzner and Foti – i.e., no modifications; never recommend bankruptcy; and give no guarantees. (Exhibit 43.)

Tarkowski was candid in admitting that this was a "law firm" where the ultimate power rested with two non-lawyers, Kutzner and Foti. While he may have sought to clean up the sales techniques, Kutzner and Foti controlled the firm's advertising and initial client intake Tarkowski's cautionary email (Exhibit 43), however, does confirm his concern that the older clients of the firm – on which the business rested – were the product of past fraudulent and deceptive practices. His energetic efforts to revive the mass joinder cases and to start new trustee cases had the consequence, possibly unintended by Tarkowski, of giving Kutzner/ Foti/ Broderick a pre-text for reviving monthly charges against old customers, and/or enlisting them for new "trustee" cases after paying a new retainer and agreeing to new monthly charges.

Tarkowski did appear to be making an effort to manage the law practice, although internal memos to the staff were cc'd to Kutzner and Foti. (Exhibit 44.)

///

# IV.

# FINANCIAL INFORMATION

We have not performed any sort of audit and the financial records are generally incomplete or in disarray.  Based on the available filed tax returns (2010-2013) and other internal financial records, we estimate that aggregate revenues into the Brookstone/Advantis entities, 2010-2014 were approximately $15 million, although we must clarify that is an estimate based on incomplete records.

The available tax returns show revenues and income as follows: $606,694/$165,374 (2010), $5.2 million/$80,295 (2011), $5.4 million/-$5,393 (2012), and $2.7 million/-$5,480 (2013).  We have been unable to confirm the status of tax returns for 2014–2015.  We do not have details, but revenues in 2014 and 2015 were likely much smaller than prior years.

According to internal compensation reports, there were initially three executives – Torchia, Kutzner, and Foti.  Torchia was identified as the Owner/Attorney and Kutzner and Foti as Executives.  According to the April 2011 version of that report (Exhibit 28), each received compensation as W-2 employees ($2,600 per month to Torchia and Foti and $3,250 to Kutzner) and as an independent contractor ($8,667 to each with Foti payments made to his entity DND Consulting and Kutzner's to Doheny Development Corporation).  In June 2011, the salaries for Foti and Torchia were increased to match Kutzner's $3,250 and Torchia's independent contractor pay was converted to W-2 payroll.  It appears that when Torchia became incapacitated, Kutzner and Foti simply replaced him with other attorneys.  But these attorneys did not share in the profits of the "law firm," those profits were split between Kutzner and Foti.

///

///

///

///

# V.

## CAN THE BUSINESSES BE OPERATED
## LAWFULLY AND PROFITABLY?

Section XV(H), of the TRO authorizes and directs the Temporary Receiver to "[c]ontinue and conduct the businesses of the Defendants in such manner, to such extent, and for such duration as the Temporary Receiver may in good faith deem to be necessary or appropriate to operate the businesses profitably, using the Assets of the receivership estate, and lawfully, if at all."

While the underlying mass joinder cases may or may not offer a potential remedy to distressed homeowners, the process by which Defendants "sold" these supposed seats at that table is terminally infected by the taking of improper advance fees in exchange for promised or guaranteed results, and deceptions in the sales pitch. I need not and do not take any position as to the ultimate merit of the mass joinder cases themselves because the businesses that initiated them were unlawful.

Dated: June 13, 2016

By:   S/ Thomas W. McNamara
      Thomas W. McNamara
      Receiver

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all participants in the case who are registered CM/ECF users.

      S/ Andrew W. Robertson
      Andrew W. Robertson