BENJAMIN J. THEISMAN, *pro hac vice*
btheisman@ftc.gov
GREGORY J. MADDEN, *pro hac vice*
gmadden@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave. NW, CC-9528
Washington, DC 20580
Tel: (202) 326-2223, -2426; Fax: (202) 326-3197

THOMAS SYTA, Cal. Bar No. 116286
tsyta@ftc.gov
FEDERAL TRADE COMMISSION
10877 Wilshire Blvd., Suite 700
Los Angeles, CA 90024
Tel: (310) 824-4343; Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

                Plaintiff,

        v.

DAMIAN KUTZNER, et al.,

                Defendants.

**No. SACV16-00999-BRO (AFMx)**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT AGAINST DEFENDANTS JEREMY FOTI AND CHARLES MARSHALL AS TO ALL COUNTS**

**Date:** August 28, 2017
**Time:** 1:30 pm
**Location:** Courtroom 7C

United States Courthouse
350 West 1st Street
Los Angeles, CA 90012

## <u>TABLE OF CONTENTS</u>

I. FACTS ...................................................................................... 2

    A.    Foti Teamed Up With Vito Torchia and Damian Kutzner to Run Brookstone's Mass Joinder Scheme. ........................................... 2

    B.    When Torchia Was Facing Disbarment, Foti Helped Enlist Marshall to Create Advantis and to Further the Scheme. ................. 3

    C.    The Corporate Defendants Defrauded Consumers Through Deceptively Marketed Mass Joinder Litigation. ............................... 5

        1.    A Consumer Survey Establishes The Misrepresentations. ...... 5

        2.    The Defendants Solicited Consumers Through Mass Mailers. ...................................................................... 6

        3.    The Defendants Then Convince Consumers to Pay Large Upfront Fees for Their Worthless Services. .......................... 9

        4.    The MARS Rule Requires Certain Disclosures, None of Which the Defendants Made .................................................. 10

        5.    Consumers Did Not Receive the Promised Benefits. ........... 11

        6.    Brookstone Obtained Ethics Advice Criticizing Their Entire Sales Process. .................................................... 12

    D.    Despite Never Providing Any Results, Foti and the Other Defendants Demanded Consumers Pay An Additional $5,000 Based on a Fraudulent "Account Due" Notice. ............................... 13

    E.    As a Result of this Conduct, Consumers Paid More Than $18 Million. ...................................................................................... 14

    F.    Foti and Marshall Were Directly Involved in the Scheme. ............. 15

        1.    From the Beginning, Foti Ran the Scheme With Kutzner..... 15

        2.    Foti Helped Draft Mailers and Sales Scripts and Responded to Consumer Complaints. ................................... 18

        3.    Foti Received and Responded to Consumer Complaints And Otherwise Had Knowledge of Bad Acts. ....................... 19

        4.    Foti was Directly Involved in the May 2016 "Account Due" Scheme .......................................................................... 21

        5.    Foti's Past Involves Telemarketing, Debt Settlement, and Attempts to Hide His Ownership of Companies. ................. 22

i

6.    Marshall Took Control of Advantis with Full Knowledge of Brookstone's Malfeasance.................................................23

7.    Marshall Has a History of MARS Fraud. ..............................25

II.  ARGUMENT ...............................................................................26

A.    The Corporate Defendants Violated the FTC Act and the MARS Rule. .................................................................................27

1.    The Corporate Defendants Formed a Classic Common Enterprise. .................................................................27

2.    Count II:  The Corporate Defendants Took Advance Fees in Violation of the MARS Rule. .............................................27

3.    Counts I & III:  Through the Common Enterprise, the Corporate Defendants Made Numerous Misrepresentations. .........................................................29

4.    Count IV:  The Corporate Defendants Failed to Make Legally Required Disclosures. ................................................31

B.    Foti and Marshall, as Individuals with Control, who Participated in the Acts, and Had the Requisite Knowledge, Must Be Held Liable for the Corporate Defendants' Conduct. .......32

1.    Foti and Marshall Are Each Liable for Injunctive Relief Because They Each Had Control. .............................................33

2.    Even Absent Control, Each Are Liable for Injunctive Relief Because Each Participated in the Wrongful Conduct. ....................................................................35

3.    A Permanent Injunction Is Required To Prevent Foti and Marshall from Hurting More Consumers. .............................36

4.    Foti and Marshall Are Monetarily Liable Because Each Had the Requisite Knowledge. .................................................37

5.    Foti and Marshall Are Liable for the Full Amount Paid by Consumers..........................................................................38

III.  CONCLUSION ...............................................................................40

ii

1

## **TABLE OF AUTHORITIES**

2

3

<u>**Cases**</u>

4

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ....................................26

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..........................................26

6

*CFPB v. Morgan Drexen Inc.*, 101 F. Supp. 3d 856 (C.D. Cal. 2015) ..................22

7

*CFTC v. Co Petro Mktg. Group, Inc.*, 502 F. Supp. 806 (C.D. Cal. 1980).............36

8

*Clark v. Capital Credit & Collection Services Inc.*, 460 F.3d 1162 (9th Cir. 2006) ..........................................................................................................................29

9

*Cliffdale Associates Inc.*, 103 F.T.C. 110 (1984) ...............................................30

10

*Decker v. NW Environmental Defense Ctr.*, 133 S. Ct. 1326 (2013) ......................29

11

*Delaware Watch v. FTC*, 332 F.2d 745 (2d Cir. 1964) .........................................27

12

*Dizon v. Asiana Airlines Inc.*, --- F. Supp. 3d ---, 2017 WL 1498187 (C.D. Cal. 2017) .............................................................................................................. 26, 34

13

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999)............................... 32, 37

14

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ......................... 33, 38

15

16

*FTC v. CD Capital Investments LLC et al.*, SACV14-01033-JLS (RNB), DE 157 (C.D. Cal. March 1, 2016) ......................................................................... 34, 38

17

*FTC v. CD Capital Investments LLC*, 2016 WL 4468549 (C.D. Cal., Aug. 22, 2016) ......................................................................................................................37

18

19

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965)....................................... 36, 37

20

*FTC v. Commerce Planet Inc.*, 815 F.3d 593 (9th Cir. 2016) ........................ 35, 39

21

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006) ........................ 31, 33

22

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997)........................................................39

23

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993)........................................39

24

*FTC v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001) ..................................................29

25

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) .............................................................................................................. 31, 36

26

*FTC v. Grant Connect LLC*, 763 F.3d 1094 (9th Cir. 2014).................... 32, 37, 38

27

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982)....................................38

28

*FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) ..................27

*FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012), *aff'd*, 644 Fed. Appx. 709 (9th Cir. 2016) ................................................... 26, 30

*FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282 (D. Minn. 1985) ..........................39

*FTC v. Lanier Law LLC*, 2016 WL 4262273 (M.D. Fla. Aug. 12, 2016) ..............37

*FTC v. Medlab*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009)................................. 26, 31

*FTC v. Network Svcs. Depot*, 617 F.3d 1127 (9th Cir. 2010)...............................27

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ................................... 30, 38

*FTC v. Publishing Clearinghouse Inc.*, 104 F.3d 1168 (9th Cir. 1997)..... 32, 33, 38

*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952) ........................................................36

*FTC v. Sameer Lakhany*, No. SACV12-00337-CJC (JPRx) (C.D. Cal. June 28, 2012), DE 136 ...................................................................................................28

*FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) .........39

*FTC v. Spectrum Resources Group, Inc.*, 107 F.3d 877 (table), 1997 WL 103406 (9th Cir. March 6, 1997) ...........................................................................35

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)....................... 26, 29, 35, 38, 39

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995)...........................................39

*Goodman v. FTC*, 244 F.2d 584 (9th Cir. 1957) ................................................34

*In re Telebrands Corp.*, 140 FTC 278, 325 (2005) ............................................30

*Litton Indus., Inc. v. FTC*, 676 F.2d 364 (9th Cir. 1982)............................... 36, 37

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............26

*Petersen v. Bank of America*, 232 Cal. App. 4th 238, (2014) .................................11

*Resort Car Rental v. FTC*, 518 F.2d 962 (9th Cir. 1975)....................................31

*Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431 (9th Cir. 1986)...........................34

*Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730 (9th Cir. 1979).......................34

*United States v. Birges*, 723 F.2d 666 (9th Cir. 1984)..........................................38

*United States v. King*, 577 Fed. Appx. 701 (9th Cir. 2014)...................................38

*United States v. W.T. Grant*, 345 U.S. 629 (1953) ..............................................36

**<u>Statutes and Regulations</u>**

12 C.F.R § 1015.4 ....................................................................................10

12 C.F.R. § 1015.2 ...................................................................................28

12 C.F.R. § 1015.4 ............................................................................. 10, 31

12 C.F.R. § 1015.5 ......................................................................... 27, 28, 29

12 C.F.R. § 1015.7 ............................................................................. 28, 29

75 F.R. 75128 ..........................................................................................29

FTC Act, 15 U.S.C. § 45 ......................................................................1, 29

FTC Act, 15 U.S.C. § 53(b) .......................................................................1

Mortgage Assistant Relief Services Rule, 12 C.F.R. Part 1015 ................1

**<u>Rules</u>**

Fed. R. Civ. P. 36(a)(3) ...........................................................................30

Fed. R. Civ. P. 37(c) ...............................................................................28

Fed. R. Civ. P. 56(c)(2) ...........................................................................26

Fed. R. Civ. P. 8(c)...................................................................................28

*"They stole my money and lied to me."*

*"We gave them about $15,000 and they packed and left town like a bunch of thieves."*

*"A lot of lies and promises.  They took money from me and nothing happened."* [1]

As these consumers report, the defendants stole more than $18 million from consumers through bogus "mass joinder" lawsuits.  They systematically lied, convincing each victim to part with thousands of dollars on baseless claims that they were likely to win lawsuits against their lenders.  Although Jeremy Foti attempted to hide his involvement, he was discovered by the Receiver on June 2, 2016.  Uncontroverted evidence confirms that he was a control person and that he also directly participated in the deceptive acts.  Charles Marshall is an admitted owner and officer of Advantis Law Group,[2] a member of the common enterprise, who also admits he furthered the scheme and did so knowing both that he was dealing with a criminal and that Brookstone had faced numerous complaints alleging fraud and unethical conduct about the very activities he was engaged in.  Both are, therefore, liable for deceptive acts in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45 & 53(b), and the Mortgage Assistance Relief Services ("MARS") Rule, 12 C.F.R. Part 1015.  Both are also liable for taking illegal advance fees and for failing to provide consumers legally required disclosures. This Court, therefore, should enter the proposed order, imposing monetary relief to

---

[1]     The Federal Trade Commission's Undisputed Statement of Facts and Conclusions of Law ("USF") at ¶ 179.

[2]     "Corporate Defendants" means Brookstone Law P.C. (California), Brookstone Law P.C. (Nevada), Advantis Law P.C., and Advantis Law Group P.C. "Brookstone" means both Brookstone Law P.C. (California) and Brookstone Law P.C. (Nevada).  "Advantis" means Advantis Law P.C. and Advantis Law Group P.C.  "Advantis Law" means Advantis Law P.C. alone, while "Advantis Law Group" means Advantis Law Group P.C. alone.

redress consumers and injunctive relief necessary to prevent Foti and Marshall from preying on consumers in the future

## I.   FACTS

The defendants' common enterprise is a group of "law firms" who deceptively advertised and sold "mass joinder" services.  With the help and support of two lawyers who have been disbarred for a similar scheme, Foti and the other individual defendants founded Brookstone.  Starting with Brookstone and extending through the creation of Advantis in 2014, the Corporate Defendants sent mailers to consumers stating that they would add them to lawsuits that would save their homes from foreclosure.  When consumers called and met with the Corporate Defendants, they received deceptive claims, including that they almost certainly would win their mass joinder lawsuits, would receive a large amount of money as a result of the mass joinder lawsuits, would have their mortgages modified or voided, or would get their homes free and clear of any mortgage.  The firms assured consumers they were the top lawyers in their field with the personnel and resources to obtain these results.  None of this was true.  As a last gasp, in May 2016 the defendants sent mailers to consumers falsely claiming they owed Brookstone another $5,000.  As a result of these various misrepresentations, the Corporate Defendants took in more than $18 million from January 1, 2011, until June 2, 2016.  Both Foti and Marshall participated in the scheme, which they controlled with knowledge of the wrongdoing.

### A.   Foti Teamed Up With Vito Torchia and Damian Kutzner to Run Brookstone's Mass Joinder Scheme.

A "mass joinder" is a lawsuit in which numerous plaintiffs are joined in a single complaint against a defendant.  Unlike a class action, the plaintiffs' cases are distinct and the plaintiffs' attorney must prove every individual plaintiff's particular case.  In late 2010, the defendants started their mass joinder operation

with the advice and support of Phil Kramer and Mitch Stein, attorneys now disbarred for running an illegal mass joinder scheme.[3]  USF at ¶¶ 32, 34, 36, 291. Stein is in prison.  USF at ¶ 35.  Kramer and Stein helped Brookstone begin marketing "mass joinder" lawsuits as a means to obtain mortgage relief.  USF at ¶ 32.  Indeed, in initial mailers and scripts Brookstone claimed Stein's *Ronald v. Bank of America* lawsuit as its own.  USF at ¶¶ 37-38.  With this help and support, Brookstone solicited consumers and filed several mass joinders, starting with the *Wright v. Bank of America* complaint with Vito Torchia as Brookstone's attorney in February 2011.  USF at ¶ 39.  Brookstone then filed similar suits against JPMorgan Chase, Wells Fargo, Ally, Indymac, and Citibank.  USF at ¶ 40.  But, by 2016, courts had dismissed all but the *Wright* case including for lack of prosecution, misjoinder, or failure to state a claim, USF at ¶ 41, leaving consumers out millions of dollars and without mortgage relief.[4]

### B. When Torchia Was Facing Disbarment, Foti Helped Enlist Marshall to Create Advantis and to Further the Scheme.

In 2014, Brookstone's nominal owner and lead attorney, Torchia, began receiving significant pressure from the California Bar, resulting in a bar trial and a ruling that Torchia had committed multiple ethics violations while running

---

[3]    Foti was fresh off the Kirkland Green debt settlement scheme discussed further below, while Torchia and Kutzner were transitioning away from United Law Group ("ULG").  USF at ¶¶ 289, 342-43.  ULG was a criminal enterprise run by Damian Kutzner that purported to offer loan modification and lender litigation services.  USF at ¶¶ 290-91; *see also id.* at ¶ 292 ("There is an error in the Guidelines, which has 'United' as the defined term for Brookstone.  This could prove highly detrimental to Brookstone because it could be seen as evidence that Brookstone is a continuation of United.").

[4]    *Wright* had also been dismissed, but an appellate court permitted Brookstone to amend and refile their complaint, while denigrating the then current complaint as unworkable and containing nothing but "scattered and desultory allegations."  USF at ¶ 43.

Brookstone.  USF at ¶¶ 44-53.  Subsequently, Torchia created both Advantis Law P.C. and Advantis Law Group P.C. in the fall of 2014.  USF at ¶¶ 54-55.  By November 2014, Foti, along with Kutzner, began recruiting Marshall to be the Advantis attorney, with responsibility for Brookstone matters.  USF at ¶ 56 (including Ex. 30, which indicates Marshall was aware Brookstone clients were paying monthly fees); *id.* at ¶ 57.  Throughout the negotiations, Marshall insisted that Foti be a part of a small group, usually including just Marshall, Kutzner, and Foti, on negotiations.  USF at ¶¶ 58-59.  Notably, Torchia was not involved in these negotiations, and Marshall testified that Foti was a negotiating principal.  USF at ¶ 58-59.  Marshall highlighted Foti's importance in the negotiations in an email to Foti in March 2015, after Marshall had signed the Advantis Law Group shareholder agreement and was finalizing other pieces of paperwork:

> The paperwork situation is absurd, to put the matter succinctly.  I will deal with it.  **You legally represent** that Advantis Law Group is a group of attorneys, yet I am the only attorney moving forward with papers, etc.  **Maybe you did the same thing with Brookstone (via Vito), and got away with it**.  News Flash:  I am not Vito, which is good news all the way around, for you, for me, for the future prospects of Advantis.

USF at ¶ 63 (emphasis added).  Marshall signed the shareholder agreement on February 27, 2015, including himself and co-defendant attorney Geoffrey Broderick ("Broderick") as the Advantis shareholders.  USF at ¶¶ 60-62.

Advantis was just a continuation of Brookstone, sharing offices, officers, employees, and principals with Brookstone.  Brookstone and Advantis occupied the same office space.  USF at ¶¶ 21-24, 64-67.  Advantis' official officers were Marshall and Broderick, and included Foti and Kutzner as principals.  USF at ¶¶ 26-28, 29-31.  Broderick, Foti, and Kutzner were also principals for Brookstone.  *Id*.  Jonathan Tarkowski, a settling defendant, declares he was hired by "Advantis Law Group," but then worked for Brookstone.  USF at ¶¶ 29, 74-76.  Phone directories identified the company as both Brookstone and Advantis, and included both Brookstone and Advantis email addresses for employees.  USF at ¶ 77.

Employees had phone lines for both Advantis and Brookstone, and the same employees would make and receive calls for both entities.  USF at ¶ 78.  The Receiver found numerous Advantis marketing materials at the Brookstone/Advantis office on June 2, 2016.  USF at ¶ 79, 82-83; *id.* at ¶ 89-91 (Foti arranging for Advantis mailers to be distributed, costs paid by Brookstone).  The Advantis website, which featured Marshall as a "Director," prominently advertised the *Wright* mass joinder as its own and used the same language from the Brookstone website to describe its real estate services.  USF at ¶ 80, 84.  The Receiver even found joint retainer agreements on behalf of both Brookstone and Advantis.  USF at ¶ 83.  Finally, the sales script for Advantis, found on site by the Receiver, is all but identical to that for Brookstone.  USF at ¶¶ 85-88.

### C. The Corporate Defendants Defrauded Consumers Through Deceptively Marketed Mass Joinder Litigation.

A survey of the Corporate Defendants' clients establishes that the mass joinders were sold with widespread misrepresentations.  The evidence regarding the sales process, and consumer declarations, confirm the accuracy of the survey.

#### 1. A Consumer Survey Establishes The Misrepresentations.

A client survey establishes that the Corporate Defendants comprehensively misrepresented the likelihood that they would obtain mortgage relief for consumers.  Dr. Bruce Isaacson of MMR Strategy Group conducted the survey in accordance with standard survey procedures.  USF at ¶ 175.  Tellingly, "80.4% of all respondents answered that Brookstone's representatives said or suggested that hiring Brookstone would **definitely** or **probably** achieve at least one of the following five outcomes:  respondents would (1) win a lawsuit against the company that holds their mortgage; (2) have the terms of their mortgage changed; (3) receive money; (4) have their mortgage voided; and/or (5) get their property

free and clear of their mortgage." USF at ¶ 176 (emphasis added).[5] This includes 64.5% who "indicated that Brookstone's representatives said or suggested they would definitely or probably win their lawsuit." USF at ¶ 177. Additionally, 54.3% "indicated that Brookstone's representatives said or suggested that they would definitely or probably receive money." USF at ¶ 181. Of those who were told they would receive money, 80.4% said they were told they would receive $75,000 or more. USF at ¶ 182. These results are corroborated by the consumer declarations already before the Court, in which consumers declare they received precisely these promises of success. USF at ¶¶ 136-39, 145-66.

### 2. The Defendants Solicited Consumers Through Mass Mailers.

The defendants began their deception by soliciting victims through mass mailers inducing consumers to call the Corporate Defendants. Consumers testified they received mailers stating: "[Y]ou may be a potential plaintiff against your lender;" Mass joinder litigation is a way to "void your note(s), and/or award you relief and monetary damages;" "[O]ur team of experienced lawyers offers you a superior alternative for recovery;" and "It may be necessary to litigate your claims against your lender to get the help you need and our lawyers know how to do so." USF at ¶¶ 99-102; *see also* USF at ¶¶ 103-12 (identifying claims made in other mailers and draft mailers). Some versions explicitly told consumers they could expect to receive $75,000 in damages. USF at ¶¶ 103-04. Others referenced the Department of Justice's multibillion-dollar settlements with the banks, suggesting that Brookstone's cases were somehow connected. USF at ¶¶ 107-09. The

---

[5]      As the survey details, if a consumer was told anything about the likelihood of any of these results, an overwhelming number were told that they would definitely or probably obtain those results. USF at ¶¶ 180, 183-84. The "Banking Specialists" did not have scripts. USF at ¶ 98. But, they were encouraged to make sales and say what they needed to in order to do so. USF at ¶¶ 98, 140, 270-71, 294.

Receiver found in the defendants' office a mailer for Advantis, referencing both Advantis Law and Advantis Law Group and stating that Marshall was the attorney issuing the marketing.  USF at ¶ 110.  This mailer, in bold type, touts that consumers might be entitled to relief as a result of multibillion-dollar settlements with banks, with no mention that Advantis was not a party to those settlements.  *Id.* Another touts Advantis and tells consumers "[i]f you are behind on your payments act now to preserve your legal rights **because the law is on your side**," representing to consumers they had viable claims against their lenders.  USF at ¶ 79 (emphasis supplied).  The mailers included Advantis/Brookstone phone numbers.  USF at ¶¶ 93, 112.

Consumers receiving these mailers testified that they then called the Corporate Defendants.  USF at ¶ 93.  To convince consumers to make appointments to meet with a Banking Specialist,[6] the sales people claimed Brookstone/Advantis was a national law firm[7] with expertise in lender law litigation.  USF at ¶¶ 118-20, 123, 125-28.  To give credence to their services, the sales agents highlighted prosecutions and settlements obtained by the Department of Justice and State Attorney Generals.  USF at ¶¶ 123, 127.  Although never having won a case, the sales agents would tout the continued existence of the mass joinders as proof of their validity:  "[Brookstone/Advantis] is a Pioneer in Mass Tort litigation and all of our landmark cases are still going through the court system.  We have had some phenomenal results in our individual cases and have

---

[6]    Some consumers did complete the entire sales process over the phone.  USF at ¶ 114.  The scripts and emails emphasize that the sales people were to insist on in person sales because they were more likely to close a deal if the person physically came to the office.  USF at ¶ 115.

[7]    USF at ¶¶ 118-20.  Brookstone never maintained more than one office with actual employees.  USF at ¶ 121.  In fact, Brookstone's ethics counsel advised against claiming to be a national law firm.  USF at ¶ 122.

been able to save hundreds of homes and have achieved many confidential settlements."  USF at ¶ 124.[8]  The Advantis scripts instructed sales agents to tell consumers that "one of our prominent cases [is] Wright v. Bank of America . . . one of the most controversial existing Mass Torts against a major lender in the nation. . . .  If you scroll down you will be able to find the many amendments that we have collectively filed with our associate counsel Brookstone Law."  USF at ¶ 129.  The script goes on to say "we have teamed up with Brookstone Law on this very High profile case and have associated on many other cases."  USF at ¶ 130.

The "Objection Techniques" script instructed sales people, when a potential customer indicated they did not want to spend any more money on their property, to say:  "Sir, I know exactly how you feel and the bottom line is, if we can't custom tailor a program that benefits you and your family we won't get to write and you won't sign it correct?"  USF at ¶ 131.  Another supplemental script directed sales people to address questions about whether the mass joinder is better than or different from a loan modification by stating:

> "Over the past few years we have taken the steps to build solid relationships with the major banking institutions to provide our clients with the relief they seek.  By having the backing of a REPUTABLE law Firm that has formed a strong relationship with the lenders as we have, **you can rest assured that we will be able to get you and your family a permanent solution.**"

USF at ¶ 132 (emphasis added).

Scripts and emails with the sales agents emphasized asking about consumers' "harms"—why consumers were falling behind on their mortgage or feel they were harmed by their banks—and then to "repeat the harms" and state because of "**the strength of your case**" the consumer should come in for an in-

---

[8]      Brookstone was still making this claim in 2016, by which time, as noted above, nearly all of Brookstone's mass joinder suits had been dismissed.

person meeting to further discuss the mass joinder litigation.  USF at ¶ 133 (emphasis added).[9]

### 3.   The Defendants Then Convince Consumers to Pay Large Upfront Fees for Their Worthless Services.

As a result, consumers attended in-person sales meetings with the Corporate Defendants' "Banking Specialists," who were nothing more than salesmen, or "closers."  USF at ¶¶ 94-98.  Uncontroverted testimony confirms that at these meetings the Banking Specialists showed consumers a "Legal Analysis" that invariably stated consumers had multiple valid causes of action against their lenders with no discussion of any defenses the lenders may have or the relative weakness of the various claims.  USF at ¶¶ 141-44, 167.  Consumers report being told:  they had "a very strong case;" prevailing in the litigation was "basically a done deal;" "it was not a question of whether I would win my cases, but how much money I would get;" "the minimum amount I would get would be $75,000;" we "were entitled to a refund as a result of litigation between the Department of Justice and Bank of America;" and "Brookstone Law would succeed eventually." USF at ¶¶ 149, 153, 155, 161-62; *see also* USF at ¶¶ 136-39, 147-48, 150-51, 154, 156-60, 163-66.  Consumers also reported being told they would get a loan modification, their property "free and clear," or that the lawsuit would convince the lender to negotiate a reduction in the principal owed.  USF at ¶¶ 139, 158.  One consumer testifies that she noticed the disclaimer in the Corporate Defendants' retainer agreement, but was still told the positive result was assured.  USF at ¶ 150 ("He said I shouldn't pay attention to the disclaimer because the case against

---

[9]      Brookstone's ethics counsel cautioned against emphasizing emotional issues with clients.  USF at ¶ 134.

1 Countrywide had already been proven.  Anthony Stout said trust me, I can assure

2 you that you will get $75,000 and the money you paid to Brookstone back.").[10]

3      In reliance, consumers paid large upfront fees.  Typically, they paid $895 for

4 the "Legal Analysis" itself.  USF at ¶ 168.  They also paid an initial fee for the

5 litigation retainer, typically $3,000.  USF at ¶ 169.  The retainer agreements

6 required monthly maintenance fees, typically $250 per month.  USF at ¶ 170.  All

7 of these fees were necessarily paid before the Corporate Defendants provided any

8 results.  The Corporate Defendants did not deposit these fees into client trust

9 accounts or IOLTA accounts.  USF at ¶ 171.

### 4.    The MARS Rule Requires Certain Disclosures, None of Which the Defendants Made

     Under 12 C.F.R § 1015.4, certain written disclosures must be made to

consumers if a company is providing MARS.  These disclosures include statements

that a consumer does not have to accept the relief, if any, obtained by the MARS

provider and do not have to make any payments until they have received the

promised relief.  12 C.F.R. § 1015.4.  No such disclosures are included in the

mailers or the retainer agreements.  USF at ¶ 185.

---

[10]    Brookstone sales staff made these claims despite being told by attorneys not
to.  In one instance, an "of counsel" attorney associated with Brookstone stated:
"**Bottom line—prospective clients are being given the numbers of $75,000
general damages and $750,000 in punitive damages.**  No mental gymnastics
related to 'guarantee', 'promise', 'no guarantee', 'estimate', 'likely', 'unlikely',
etc. can change that fact.  **The prospective client hears numbers only.  That's
how any reasonable outside person will look at that.**"  USF at ¶ 140 (emphasis
added).

### 5.   Consumers Did Not Receive the Promised Benefits.[11]

#### a.   Defendants Never Won a Judgment in Their Mass Joinder Litigation.

None of the mass joinders were successful.  USF at ¶ 186.  Of those filed prior to 2016, all but *Wright* had been dismissed and none resulted in a judgment. USF at ¶¶ 187-96.  *Wright*'s history does not indicate it would fare any better.  It had been dismissed by the trial court for misjoinder.  On appeal, the court held only that a mortgage mass joinder was possible, while disparaging the allegations in the complaint and noting that, as pled by the Corporate Defendants, the case was not viable.  *Petersen v. Bank of America*, 232 Cal. App. 4th 238, 254 (2014) (describing the complaint as being comprised of "desultory and scattered allegations").[12]  Following that appeal, *Wright* still has not advanced beyond the filing of a complaint.  USF at ¶ 188.  A demurrer is pending and many of the plaintiffs have stipulated to dismiss their claims with prejudice in exchange for Bank of America agreeing not to seek costs.  USF at ¶ 190.

#### b.   Defendants Did Not Seek to Void Consumers' Mortgage Notes Through the Mass Joinder Litigation.

Despite luring consumers with contrary representations, the mass joinder lawsuits do not even attempt to void consumers' notes.  If they did, the banks could remove the cases to federal court, where they would be promptly dismissed for misjoinder under the Federal Rules of Civil Procedure.  To avoid this result, the defendants contradicted their promises to clients and opposed removal by stating that the lawsuits do not seek to void consumers' notes.  USF at ¶ 197.

---

[11]   USF at ¶ 174.

[12]   *Petersen* is *Wright*.  For the appeal, the defendants captioned the case with Petersen as the first-named plaintiff.

### c.   Defendants Failed to Add Many Consumers to Mass Joinder Litigation.

Many consumers who signed up were not even added to a mass joinder. They paid upfront and monthly fees, frequently totaling more than $5,000, and received nothing in return.  USF at ¶ 199.

### d.   Defendants Do Not Have the Promised Legal Team Capable of Achieving the Promised Results.

Contrary to the Corporate Defendants' represented experience and capability, the California Bar found Torchia "lacked and continues to lack the law-office-management skills and basic knowledge of mortgage lending law and bankruptcy law necessary to adequately and properly represent some 4,000 mortgage loan clients and to adequately supervise a law office staff of 30 to 40 employees," almost all of whom are sales people.  USF at ¶ 200.  Following Torchia's effective disbarment, Tarkowski, a lawyer admitted to the bar in 2014 with no experience suggesting he could effectively litigate hundreds of simultaneous fraud cases, became the primary lawyer of record.  USF at ¶¶ 201-02. Marshall also does not provide the relevant experience or capability.  He testified that he had no experience with mass joinder litigation.  USF at ¶ 203. Furthermore, courts frequently dismiss his cases with prejudice without leave to amend because they have no legal merit.  USF at ¶ 204.

### 6.   Brookstone Obtained Ethics Advice Criticizing Their Entire Sales Process.

In spring 2011, Brookstone retained ethics counsel, who generally criticized the entire sales operation.  Regarding the mailers, the ethics counsel warned that statements regarding past successes, like "cash settlement," or homes "free and clear," were deceptive.  USF at ¶ 113.  The ethics counsel further stated that including an "expiration date" on the mailers was deceptive.  *Id*.  Regarding the telephone scripts, the ethics counsel expressed concern that sales people were improperly playing on consumers' emotions.  USF at ¶ 134.  When consumers then met with Banking Specialists, the ethics counsel explained that the Banking

12

Specialists were very likely engaged in the unauthorized practice of law.  USF at ¶¶ 95, 98.  Furthermore, the ethics counsel explained that it likely violated ethics rules for any of the sales people to be paid on a commission basis, as they were.  USF at ¶¶ 96, 240.  The ethics counsel had concerns about general aspects of the marketing, including claims to be a "national" law firm.  USF at ¶ 122.  Regarding Brookstone's operations as a law firm, the ethics counsel was dismayed to see that Brookstone did not seem to conduct client conflict checks.  USF at ¶ 173.  The ethics counsel also criticized the fee structure, explaining that the fees were not actually fully earned or non-refundable because they were not "true retainers" under California law.  USF at ¶ 172.  This was problematic, because it was apparent that Brookstone had no way to justify how or if it had actually earned any fees paid to it if and when a consumer cancelled and demanded a refund of unearned fees.  *Id.*  Foti received copies of these ethics opinions.  USF at ¶¶ 253-54.  After receiving one such piece of advice, he cavalierly stated:  "I think we need to keep in mind he is an ethic's [sic] attorney so he is going to always say you shouldn't do this you shouldn't do that."  USF at ¶ 255.

**D.    Despite Never Providing Any Results, Foti and the Other Defendants Demanded Consumers Pay An Additional $5,000 Based on a Fraudulent "Account Due" Notice.**

On May 5, 2016, Brookstone mass mailed an "ACCOUNT DUE" letter to clients claiming each owed Brookstone $5,000 for past work done on the *Wright* appeal.  USF at ¶ 205.  Attempting to extort additional monies from its clients, the defendants claimed:

• "Your file needs immediate attention as we show there is an outstanding balance. We need this to be cleared up with accounting so we can continue to represent you as a plaintiff on this case;"

• "**We do have several options for you in order to make it financially feasible for you to continue to have our firm represent you in this case**.

13

Attached please find an invoice for services provided and an amount that is currently due" (bold original); and

• "Call today to get your account off 'Accounting Hold.'"

USF at ¶¶ 206-08.  The attached "invoice" claimed $5,000 due for over 1,800 hours purportedly spent working on the *Wright* appeal.  USF at ¶ 209.   The invoice claimed "hours" worked more than two years earlier.  USF at ¶ 210.  The mailing was apparently indiscriminate, seeking money from clients who had not agreed to additional billings, clients who had regularly made their monthly payments, and even some clients who had long since terminated Brookstone.  USF at ¶ 212.  Furthermore, the mailers claimed a preposterous 1,237 hours for the opening brief, forming the basis for the $5,000 demand from these previously defrauded clients.  USF at ¶ 210.  The Corporate Defendants did not track attorney hours worked and had no system to do so.  USF at ¶¶ 172, 211.

### E.   As a Result of this Conduct, Consumers Paid More Than $18 Million.

The Corporate Defendants' bank records show revenues of $18,146,866.34, including deductions for refunds and credit card chargebacks.  USF at ¶ 213.[13] This sum takes into account internal transfers amongst the Corporate Defendants' accounts, insuring there is no double counting of income.  Using the same methodology, the bank records show revenues of $1,784,022.61 following February 27, 2015, when Marshall officially became an Advantis owner and officer.  USF at ¶ 214.

---

[13]   All or nearly all of the Corporate Defendants' income derives from the mass joinder litigation alleged in the complaint.  *See* USF at ¶ 39.

14

**F.    Foti and Marshall Were Directly Involved in the Scheme.**

**1.    From the Beginning, Foti Ran the Scheme With Kutzner.**

Foti first teamed up with Brookstone in late 2010.  USF at ¶ 215.  In November 2010, Kutzner sent Foti a Brookstone telemarketing script, and Foti responded by telling Kutzner to send him all other scripts because he was getting the marketing and sales operation up and running.  USF at ¶ 216.[14]  Within a couple days, Foti responded further, providing edits to the sales script Kutzner sent him, writing:  "Check it out made some minor, but good changes."  USF at ¶ 269.  On November 30, 2010, Foti then instructed Kutzner that he was bringing in numerous employees, several of whom were sales people and former employees of Foti's previous enterprises and telling Kutzner:  "It is go time let's hit it full throttle."  USF at ¶ 217.  In early December 2010, Foti sent Kutzner an email, explaining his proposal that he and Kutzner be "50/50" partners on the lender litigation business.  USF at ¶ 218.

Although Foti tried to avoid official titles, the Receiver found phone directories listing him as "management" and "VP of Marketing."  USF at ¶¶ 220-21; *see also* USF at ¶ 222, 232-33, 250.  When applying for health insurance, Foti claimed to be Brookstone's "CFO."  USF at ¶ 223.  Foti received the same amount of income as the other two principals, Torchia and Kutzner, and was listed as an "executive" with them on documents listing Brookstone employees and their pay, and on other documents.  USF at ¶¶ 224-26, 250-51; *see also* USF at 222 (tenant contact information listing Foti as an executive).

---

[14]    Foti wrote:  "Send me the rest of your scripts.  I am putting an ad in to hire people and have leads starting on Thursday.  We are set to have our screeners answer calls as soon as tomorrow.  If calls dump into screens they will get all the mortgage info then transfer the call over to your QC person.  I think the flow can be a little smoother that is why I want to look at the scripts.  I will work on a little bit shorter process, but will still have the same effect with the client.  Let me know what you think."  USF at ¶ 216.

Indeed, Foti admits the authenticity of the "Deal Memo," in which he memorialized his control.  USF at ¶¶ 227-28.  This memo is an agreement between Torchia, Kutzner, and Foti, including the following relating to day-to-day management:  "[T]here will be a majority rule in the voting decision amongst the shareholders of the firm and non-attorneys (Employees) Jeremy Foti and Damian Kutzner."  USF at ¶ 228.[15]  As late as 2015, Kutzner was showing this document to third parties, explaining that he and Foti were "partners" of Brookstone.  USF at ¶ 230.

Foti's own declarations to the Court confirm these facts.  He began working at Brookstone in late 2010.  USF at ¶¶ 215, 231.  He declared that his role included:  (1) "[M]anagement services related to referral services, hiring/recruiting, vendor relations, IT relations, and data sources;" (2) "Obtain[ing] estimates and costs for expenses associated with day to day operations;" (3) "Obtain[ing] or arrang[ing] for the preparation of law firm supplied creative content, advertising, campaign management and other related services;" and (4) "Audit[ing] all invoices and expenses provided by third-parties to ensure accuracy, including but not limited to payroll bonuses and employee compensation."  USF at ¶ 231.[16]

Foti admitted he was responsible for determining the bonuses for the defendants' sales personnel.  USF at ¶ 236.  Numerous documents confirm this role.  USF at ¶¶ 236-39.  Emails establish that Foti analyzed the "quality" of sales, making judgments regarding whether a bonus was actually owed.  USF at ¶ 237.  Indeed, Foti's authority included determining whether one of Advantis' managing

---

[15]    In accordance with this agreement, Foti later provided funding for Brookstone's ordinary expenses.  USF at ¶ 229.

[16]    Foti was promised a "turnkey private office space" for the duration of his work at Brookstone.  USF at ¶¶ 232-33.  An alleged "sub-lease" between him and Brookstone, also includes indemnification, in which Foti broadly holds Brookstone "harmless from any and all claims brought by a third party. . . ."  USF at ¶ 234.

16

attorneys, Broderick, was entitled to bonuses for collection activities.  USF at ¶ 239.  Throughout, he determined the bonuses based on the number of sales, despite having received a copy of an opinion from Brookstone's ethics counsel stating that sales-based bonuses violated California's ethics rules.  USF at ¶¶ 96, 237-38, 240, 253-54.

Foti also managed the sales people.  He sent emails establishing sales guidelines and admonishing sales people for not following proper procedures.  USF at ¶¶ 241-45, 247.  Starting in 2010, he sent materials to sales people explicitly instructing them on what to say to consumers to make a sale.  USF at ¶ 271.  He provided "leads" to sales people, instructing them on who to call.  USF at ¶¶ 242-43.  Foti took part in meetings to determine the sales process.  USF at ¶¶ 245-46.  Foti would also distribute scripts to the sales people.  USF at ¶ 247.

Witness testimony further corroborates Foti's control.  Torchia, the purported owner of Brookstone, declared:  "Although Jeremy Foti was technically a 'consultant' for Brookstone, he was, along with Damian Kutzner, responsible for all non-legal aspects of Brookstone's operation."  USF at ¶ 248.  Former Brookstone and Advantis attorney Jonathan Tarkowski declared:  "Damian Kutzner and Jeremy Foti, another non-attorney, were responsible for Brookstone/Advantis financial matters.  Damian Kutzner and Jeremy Foti supervised the individuals primarily responsible for customer contact—the 'Civil Litigation Representatives' (CLRs) and 'Banking Specialists.'"  USF at ¶ 249.  Josephine Lobo, Brookstone's bookkeeper, testified that Brookstone's only management was "Vito [Torchia], Damian [Kutzner], and Jeremy [Foti]."  USF at ¶ 250.  She further testified that Torchia, Kutzner, and Foti received identical compensation from Brookstone.  USF at ¶ 251.

Foti claimed in his interrogatory responses that he was nothing more than a consultant with no authority.  The FTC issued a request for production of all

1   documents substantiating that response and Foti has not produced any documents

2   controverting the evidence discussed above.  USF at ¶ 256.

### 2.   Foti Helped Draft Mailers and Sales Scripts and Responded to Consumer Complaints.

Foti participated directly in the deceptive conduct.  From the beginning, Foti
was directly involved in creating and sending mailed advertisements, or "mailers."
He testified that his consulting companies, GAMC Services and Webstar, were
both retained to arrange distribution of mailers.  USF at ¶¶ 257, 259-60.  Numerous
emails also show Foti circulating and receiving mailers and proposing language for
the mailers.  USF at ¶¶ 261, 264-67.[17]  In one, Foti identifies the types of claims
they should be making and who they should be targeting.  USF at ¶ 263 (including:
"Add to mailer –Mass joinder lawsuit claiming trial loan modification fraud").
Additionally, Foti sent an email to Kutzner in March 2015, with the subject line
"info for mailer" stating:  "This is what I am thinking for inside message for
mailer" and then including proposed text to sell current clients on additional
litigation.  USF at ¶ 264.   Foti also sent text to subordinates at Brookstone, had
subordinates create mailer proofs incorporating that text, and then further arranged
the distribution of those mailers.  USF at ¶ 265.

Moreover, emails confirm Foti was also directly involved in the sales
process.  He oversaw the sales operation, being regularly included on emails to the
sales staff.  USF at ¶ 268.  Throughout the scheme's existence, Foti was involved
in various drafts of scripts, on multiple occasions being asked to approve scripts
for use by the sales staff.  USF at ¶¶ 269-75.  Included among these is a
particularly telling email from Kutzner to Foti in April 2015:  "Another BIG issue
we MUST update the SCRIPT!!  ME and YOU…..  LETS DO THIS!!!"  USF at ¶

---

[17]   Although Foti claims that all of the mailers were approved by attorneys, this
is not true.  *See, e.g.,* USF at ¶ 262.

18

275 (emphasis in original).  Although there were no official scripts for closers, as soon as Foti started working with Brookstone, he sent emails suggesting what closers should say to make sales, including lines like "If your case is not strong enough we can't risk the validity of these cases so we would not be able to represent you" and "[t]hese attorneys are so sure that they will win that they will defer 95% of their fee and charge it ONLY IF THEY WIN."  USF at ¶ 270.[18]

The FTC issued an interrogatory regarding Foti's daily duties, and a document request for all documents to substantiate his response.  He did not produce any documents controverting the FTC's evidence discussed above.  USF at ¶¶ 256, 276-77.

### 3.    Foti Received and Responded to Consumer Complaints And Otherwise Had Knowledge of Bad Acts.

Foti's role included receiving and responding to consumer complaints.  The Receiver found hundreds of "chargebacks" in Foti's office.  USF at ¶¶ 279-80.[19] *See also* USF at ¶ 281 (Foti received other correspondence complaining about the Corporate Defendants' services); USF at ¶ 294 (Foti receiving email in which an intermediate manager writes that the sales people "stretch the truth" to make sales). In November and December 2014, Brookstone's answering service forwarded to

---

[18]    In December 2010 Foti wrote an email to sales staff directing them to say the following:  "As a case specialist it is my job to see if you are ready to join the case.  As you are aware the attorneys have approved your case so all we need is the signed retainer and a check to get this going.  Remember that 99% of the law firms fees are only earned if they win the case so they feel pretty good about your chances of winning."  USF at ¶ 271.

[19]    A "chargeback" occurs when a consumer reverses a charge on their credit card.  The chargeback responses attempt to justify the charges, claiming Brookstone had authority to make the charges despite the consumer's cancellation. One such response includes a plainly doctored credit card authorization form.  USF at ¶ 282 (the signature has an incorrect date and the signature block is both the wrong size and inconsistent with the rest of the text on the document).

Foti consumers' voice messages complaining about unfulfilled promises and not being able to reach Brookstone.  USF at ¶ 283.  Tarkowski also sent an email to Foti, among others, relating concerns that consumers were reporting to him that they had been promised they would prevail in the mass joinder litigation or otherwise obtain relief.  USF at ¶ 284.  Not only did Foti receive complaints, he personally responded to them.  In fall 2015, the Corporate Defendants sent an email to consumers who had cancelled their services, urging the consumers to resign-up because Brookstone is "very confident we will prevail."  USF at ¶¶ 285-86.  Foti helped draft, send, and respond to this notice.  *Id.*  One consumer complained to Foti:  "I am unwilling to put more money into this 'possibility.'  Back when this all started I was promised many things that were never delivered."  USF at ¶ 286.  Foti countered, "we think things looks [sic] promising."  *Id.*[20]

Foti was aware of Kutzner's history, but nonetheless did business with him.  He testified that he was aware the FTC had pursued Kutzner.  USF at ¶ 287.  He was also aware that ULG had been shut down by criminal law enforcement.  USF at ¶ 288.  Kutzner's history apparently was general knowledge within the company.  In 2012, Foti and Kutzner received an email from Gil Mariscal, stating:

> When the crap came down with the U.S. Attorney I gave you [Kutzner] information to try to help you out and whether it was helpful or not is irrelevant, I was trying to look out for you.  If you don't think that was loyalty then I would have kept my mouth shut and would not have led those investigators in a different direction.  **Jeremy knows the person leading the investigation** and he believes what I say because the guy has not [sic] reason to doubt me.  I told him Brookstone had nothing to do with all the bullshit

---

[20]    Foti was also involved in collections.  In an email exchange with Kutzner, where they are trading barbs about their abilities to squeeze payments from consumers who had stopped paying, Foti bragged:  "I took a small amount of them (50) and closed 36."  USF at ¶ 278; *see also* USF at ¶ 285 (drafting and responding to emails pressuring clients for more money).

> Kramer/Kaslow and ULG did and they left it alone. You know those people came to my home and I never said shit to them. I instead picked up the phone and called off the dogs and sent them in a different direction. For them to try to pull Jeremy and me into an investigation that we had nothing to do with is beyond me. If you don't think that was loyalty Damian, then I don't know what is.

USF at ¶ 291 (emphasis added).

The FTC issued Foti an interrogatory regarding his interactions with consumers, and he generally denied all communications with consumers. The FTC also issued a request for production for all documents substantiating that response, and he has failed to produce any documents controverting the FTC's evidence. USF at ¶ 295.

### 4. Foti was Directly Involved in the May 2016 "Account Due" Scheme.

As described above, Brookstone sent consumers fraudulent notices demanding an additional $5,000 in May 2016. Foti knew about this outrageous effort before it went forward and participated in efforts to collect "outstanding balances" from clients after the fraudulent letters were sent. Email correspondence shows that Foti was involved from the beginning, creating and distributing various drafts of the letter and fraudulent invoice. USF at ¶ 296. When complaints started rolling in, Foti received at least some of them and emailed other staff to respond to them. USF at ¶¶ 297-99. In one such email that Foti received and directed a staff member to respond to, the consumer complained about the Account Due letter and invoice, explaining that a Brookstone salesman had already extorted an additional $1,500 out of her by telling her the *Wright* case was near resolution and she needed to make the payment to ensure she would be included in the judgment distribution. USF at ¶ 299.[21] Regarding collections activities related to these letters, the

---

[21] *Wright* was not near resolution. In 2015 it did not even have a complaint on file. USF at ¶ 300.

Receiver also found on Foti's desk copies of the "Accounting Inbound SCRIPT (Inbound)" with handwritten notes about the "accounting hold" referred to in the May 5 letter, as well as a printout tallying the results of the collection efforts with the title "Damian and Regina Crushing IT!!!"  USF at ¶¶ 301-02.

**5.    Foti's Past Involves Telemarketing, Debt Settlement, and Attempts to Hide His Ownership of Companies.**

Foti's history shows a pattern of illegal and unethical behavior and attempts to hide his involvement with companies.  In the 2000s, Foti owned and operated a mortgage brokerage called Americor Lending Group Inc. ("Americor").  USF at ¶ 338.  For acts that took place while Foti was an owner and operator, the State of Washington cited Americor for alleged bogus lending practices and the Federal Communications Commission cited Americor for illegal telemarketing.  USF at ¶¶ 339-40.  Following Americor, Foti moved behind the scenes to assist in debt settlement businesses, an industry rife with fraud.  75 FR 48463 (as part of explaining strict new rules for the debt settlement industry, the FTC explained that there was "widespread deception in this industry").  Foti provided consulting services, office space, and capital to Morgan Drexen, Inc. ("Morgan Drexen").  USF at ¶ 341.   The Consumer Financial Protection Bureau sued Morgan Drexen in 2013 for charging illegal advance fees for its services.  In 2015, the CFPB obtained a final judgment against Morgan Drexen as a discovery sanction after proving Morgan Drexen fabricated evidence in discovery.  *CFPB v. Morgan Drexen Inc.*, 101 F. Supp. 3d 856 (C.D. Cal. 2015).   In the late 2000s, Foti also began operating Kirkland Green, another debt settlement company that has generated consumer complaints.  USF at ¶¶ 342-43; *see also* USF at ¶ 344 (while working with yet another debt settlement business, Foti interceded to reduce attorney supervision of  salespersons' telephone calls because the attorney was admonishing sales staff not to make guarantees).

Foti attempted to hide his involvement.  In addition to avoiding official titles, he has admitted using "shelf companies" with "nominee services," which

22

allow him to own companies while hiding his ownership from the public.  USF at ¶
345.  Webstar Inc., a central company in the current fraudulent scheme, was just
such a shelf company.  USF at ¶ 346.  Foti funneled more than $1.5 million to this
company while hiding his ownership of Webstar from Brookstone's purported
owner, Vito Torchia.  USF at ¶¶ 346-47.  Following the TRO, Foti reached out to
the FTC, claiming to be a consultant for an entity other than the Corporate
Defendants.  USF at ¶ 349.  Tellingly, his agreements with the Corporate
Defendants include confidentiality provisions that prevented the Corporate
Defendants from disclosing his work for them.  USF at ¶ 348.

### 6. Marshall Took Control of Advantis with Full Knowledge of Brookstone's Malfeasance.

As Advantis, Marshall furthered the scheme.  Marshall intended to transfer
clients from Brookstone to Advantis.  Indeed, he sent letters informing Brookstone
clients that their cases were being transferred to him.  USF at ¶ 303-04.  Multiple
emails confirm this fact, including those from numerous Brookstone/Advantis
employees who used their advantislaw.com email addresses and claimed various
Advantis titles in their email signature blocks.  USF at ¶¶ 306-07; *see also* USF at
¶ 57 (Kutzner writing to Marshall that Brookstone is a "dead hoarse" and Advantis
needs to leverage Brookstone's existing clients).  Marshall demanded that
marketing for Advantis be "full on."  USF at ¶ 305.  Marshall understood that
Kutzner and Foti would be doing the marketing, just as they had for Brookstone,
and he relied on them alone for the legality of the marketing, without reviewing the
solicitations he was demanding they send out.  USF at ¶ 308, 324-27.  Foti, in fact,
instructed vendors to issue the marketing, which Brookstone paid for.  USF at ¶¶
89-91.  Marshall also represented the Brookstone clients in the *Wright* litigation as

an attorney from Advantis Law Group.  USF at ¶¶ 310-16.[22]  His emails stress that his representation in the *Wright* matter was critical to moving the case forward.  USF at ¶¶ 314-15.  Marshall testified he intended to use the "Advantis" name to file new mass joinders and that he was representing the plaintiffs in the *Wright* case to enhance the apparent legitimacy of mass joinders.  USF at ¶ 313.  Moreover, shortly after completing his bar suspension during the winter of 2015-16, Marshall deepened his involvement in Brookstone matters, telling Jonathan Tarkowski that, per instructions from Foti and Kutzner, he would need "access to all the pleadings for recent Brookstone joinder cases that you filed.  I need to review and assess status of hearings, pleadings, **next steps**, etc."  USF at ¶ 317 (emphasis added).

Marshall regularly received and responded to emails from Advantis employees.  USF at ¶ 307.  He also met with Advantis/Brookstone sales people to discuss marketing.  USF at ¶ 309.  In negotiating their business arrangement, Marshall, Foti, and Kutzner all referred to Advantis Law Group generically as "Advantis" or "Advantis Law."  USF at ¶ 318.  Marshall signed a payment processing agreement for "Advantis Law."  USF at ¶ 319.  Finally, he made an appearance *in this case* on behalf of Advantis Law and Advantis Law Group, and even *signed* the stipulated preliminary injunction on behalf of Advantis Law and Advantis Law Group.  USF at ¶ 320.

---

[22]    Marshall claims that during this time most of his work was still being done under the Law Offices of Charles Marshall, not Advantis.  He appears to be arguing he was violating California Rule of Professional Responsibility 1-400, Standard 9, making it a presumed violation if an attorney issues "[a] 'communication' in the form of a firm name, trade name, fictitious name, or other professional designation used by a member or law firm in private practice which differs materially from any such designation used by such member or law firm at the same time in the same community."

While creating Advantis, Marshall was aware of Brookstone's, Kutzner's, and Broderick's legal issues. USF at ¶¶ 321-23, 328-32. Marshall testified that he was aware that Torchia and Brookstone were facing bar discipline related to the mass joinder practice. USF at ¶ 321. Marshall also testified that he was aware of Kutzner's history, including ULG and its history with criminal law enforcement. USF at ¶ 323. Finally, Marshall sent emails and demanded conference calls regarding Broderick's mass joinder history. USF at ¶ 328-32. In one such email, he acknowledged Brookstone's and Broderick's history was creating "a lot of liability for me," but wanted to continue because "[a]t the end of the day, though, we are in complete agreement that this is fundamentally a business decision. So I am moving forward in that light. The business prospect still looks quite good." USF at ¶ 332.

Importantly, Marshall knew that Advantis misrepresented its capabilities, telling Foti that Advantis was not a "group of attorneys" as Foti was representing, but that Marshall was the "only attorney moving forward." USF at ¶ 333. Marshall also knew about the Advantis website's multiple misrepresentations regarding the "firm's" experience, locations, areas of practice, attorneys, paralegals, and legal assistants. USF at ¶ 334.

As with Foti, the FTC issued interrogatories and requests for production related to Marshall's liability and control. Marshall did not identify any defenses or identify or produce any documents controverting the FTC's evidence. USF at ¶¶ 335-37.

### 7.   Marshall Has a History of MARS Fraud.

Marshall's history is troubling. In October 2011, he stipulated to findings that he violated his ethical duties to five different sets of clients related to short sale and loan modification representations. USF at ¶ 350. The gist of the complaints and stipulations are that Marshall took advance fees for work that he then did not perform. *Id.* Apparently not learning his lesson, in December 2013 and June 2015

1   Marshall stipulated to findings that he took illegal advance fees for loan

2   modification work.  USF at ¶¶ 351-54.  In both instances, he told his clients the

3   fees were for "litigation," but he never pursued any litigation.  *Id.*

4   **II.   ARGUMENT**

5       Summary judgment is appropriate on all counts because "the pleadings,

6   discovery and disclosure materials on file, and any affidavits, show that there is no

7   genuine issue as to any material fact and that the [FTC] is entitled to judgment as a

8   matter of law."  Fed. R. Civ. P. 56(c)(2).[23]  Material facts are "facts that might

9   affect the outcome of the suit," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

10   (1986), and the Court views the evidence in the light most favorable to the non-

11   moving party.  *Stefanchik*, 559 F.3d at 927.  "Once the moving party has met its

12   burden, the non-moving party 'must do more than simply show that there is some

13   metaphysical doubt as to the material facts.'"  *Dizon v. Asiana Airlines Inc.*, --- F.

14   Supp. 3d ---, 2017 WL 1498187 at *2 (C.D. Cal. 2017) (quoting *Matsushita Elec.*

15   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Additionally, "[a]

16   genuine issue of material fact must be more than a scintilla of evidence, or

17   evidence that is merely colorable or not significantly probative."  *Id.* (citing *Addisu*

18   *v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000)).

19       Here, there is no genuine dispute regarding any material fact relating to

20   Foti's and Marshall's liability for the deceptions and rule violations at the heart of

21   the scheme, rendering them liable under all counts.  Both are liable for injunctive

22   relief because they each had control over the Corporate Defendants and

23   participated in the wrongful conduct.  Each is monetarily liable because they had

24   the requisite knowledge of the wrongful conduct.  They are thus liable for the full

25    

26   [23]   The FTC routinely seeks and is granted summary judgment in its cases.  *See,*

27   *e.g., FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009); *FTC v. John Beck Amazing*
    *Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012), *aff'd*, 644 Fed. Appx. 709

28   (9th Cir. 2016); *FTC v. Medlab*, 615 F. Supp. 2d 1068 (N.D. Cal. 2009).

amount paid by consumers, more than $18 million for Foti and nearly $2 million for Marshall.  To deter and prevent future misconduct, they must be banned from any debt relief work, and the FTC must be given sufficient compliance monitoring tools to enforce those bans.

**A.    The Corporate Defendants Violated the FTC Act and the MARS Rule.**

**1.    The Corporate Defendants Formed a Classic Common Enterprise.**

Brookstone and Advantis formed a classic common enterprise, rendering both equally liable for any wrongdoing.  The touchstone of a common enterprise is operating through a "maze of interrelated companies" with shared control, office space, employees, and services.  *See Delaware Watch v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964); *FTC v. Network Svcs. Depot*, 617 F.3d 1127, 1142 (9th Cir. 2010) ("[Q]ualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues."); *accord FTC v. J.K. Publications, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) (common enterprise shown where corporate defendants were under common control; shared office space, employees, and officers).  This standard is easily met here.  As discussed above, Brookstone and Advantis shared staff and office space at multiple locations. They had significant overlap in owners and direct overlap in control persons, including Foti.  They also assisted one another in furthering the scheme, with Advantis coming on board when Torchia was being disbarred, using virtually the same misrepresentations in mailers, scripts, and websites.

**2.    Count II:  The Corporate Defendants Took Advance Fees in Violation of the MARS Rule.**

There is nothing in dispute regarding the Corporate Defendants' illegal advance fees.  The Corporate Defendants took advance fees for their MARS work, in violation of 12 C.F.R. § 1015.5.  Foti admits that the Corporate Defendants were MARS providers and that the mass joinder services were MARS.  USF at ¶ 25. Both are unquestionably true.  The mailers and scripts plainly offer services

designed to obtain mortgage relief for consumers, a fact corroborated by consumers reporting they were promised loan modifications, void mortgage notes, or principal reductions on their mortgage notes. 12 C.F.R. § 1015.2 (defining MARS); USF at ¶ 25. *See also FTC v. Sameer Lakhany*, No. SACV12-00337-CJC (JPRx) (C.D. Cal. June 28, 2012), DE 136 at 5 (mass joinder defendants were MARS providers).[24]  Under the MARS Rule, the Corporate Defendants could only take a fee upon providing the promised result. 12 C.F.R. § 1015.5. All of the fees taken by the Corporate Defendants are advance fees because they never won a single mass joinder case or obtained any of the promised relief. This includes the "legal analysis" fees, the initial retainer fees, and the monthly maintenance fees.

Foti and Marshall are barred from asserting the attorney exemption to the advance fee ban.[25]  The exemption, 12 C.F.R. § 1015.7, is an affirmative defense.[26] Foti and Marshall waived the defense by not pleading it.[26] *See* Fed. R. Civ. P. 8(c); *Sameer Lakhany*, DE 136 at 5-6 (attorney exemption is a defense for which defendants have the burden of proof); *Clark v. Capital Credit & Collection*

---

[24]     The FTC issued discovery regarding Marshall's defenses and seeking all documents relating to whether the Corporate Defendants were MARS providers. Marshall identified no defenses and did not produce any documents related to whether the Corporate Defendants were MARS providers. USF at ¶¶ 335-37.

[25]     Indeed, Marshall will be precluded from establishing any facts to support any defense. Because he has never provided initial disclosures, USF at ¶ 335, he is precluded from introducing evidence supporting his "defense." Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or harmless.").

[26]     In response to an interrogatory asking Marshall to identify all defenses he may assert, he identified none. USF at ¶ 335. He also did not identify any defenses or documents controverting the FTC's evidence against the Corporate Defendants. USF at ¶ 337.

28

*Services Inc.*, 460 F.3d 1162, 1176-77 (9th Cir. 2006) (ruling that similar statutory exemption under the Fair Debt Collection Practices Act is an affirmative defense); DE 94 (Foti's answer, not asserting this defense); DE 149 (Marshall's answer, not asserting any defenses).

Regardless, they could not meet the exemption because it is uncontroverted that they failed to meet at least two of the prerequisites for the exemption.  The attorney exemption only applies to those who comply with ethics obligations and deposit advance fees in client trust accounts.  12 C.F.R. § 1015.7(a) (requiring compliance with ethics obligations);[27] 12 C.F.R. § 1015.7(b) (requiring advance fees to be deposited in client trust accounts).  Defendants did neither.  USF at ¶¶ 44-53 (bar ruling that Torchia violated ethics obligations); USF at ¶¶ 95-96, 98, 113, 122, 134, 172-73, 240 (Brookstone's ethics opinions identifying numerous problems with the operation); USF at ¶ 171 (no trust accounts).

### 3. Counts I & III:  Through the Common Enterprise, the Corporate Defendants Made Numerous Misrepresentations.

There is no factual dispute that the Corporate Defendants violated Section 5 of the FTC Act, prohibiting "unfair or deceptive acts or practices."  15 U.S.C. § 45(a).  "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'"  *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (quoting *FTC v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001)).  The MARS Rule similarly prohibits the sale of MARS through misrepresentations.  12 C.F.R. § 1015.3(b).  Here, the undisputed facts show the Corporate Defendants made numerous, false, material express

---

[27]   *See* FTC's MARS Rule Statement of Basis and Purpose, 75 F.R. 75128. The FTC's interpretation and explanation of its own rule has nearly the same force as the rule's text.  *See, e.g., Decker v. NW Environmental Defense Ctr.*, 133 S. Ct. 1326, 1337 (2013).

claims to consumers.  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095-96 (9th Cir. 1994) ("Express product claims are presumed to be material.").  *See also* FTC Policy Statement on Deception, Oct. 14, 1983, reprinted in *Cliffdale Associates Inc.*, 103 F.T.C. 110, 175 (1984) (stating an "act or practice . . . likely to affect the consumer's conduct or decision with regard to a product or service" is material). They falsely claimed: (1) that there was a high likelihood of success in the mass joinder litigation; (2) that consumers were likely to receive monetary payments;[28] (3) that the Corporate Defendants were likely to void consumers' mortgages; (4) that the Corporate Defendants had a team of legal professionals capable of litigating the cases as promised; (5) for some consumers, that they would be added to a mass joinder lawsuit; and (6) for some consumers, that they owed an additional $5,000.[29]

Nobody got the promised results.  In fact, all of the mass joinder lawsuits were dismissed or, in the case of *Wright*, have never advanced beyond the filing of a complaint.  The FTC issued discovery to Foti and Marshall requesting all documents relating to whether the claims were truthful.  Neither identified or produced any documents in response.  The FTC issued Marshall Requests for Admissions, requesting that he admit certain statements were made and that they were false.  Marshall did not respond.  As a result, Marshall has admitted the Corporate Defendants' liability.  Fed. R. Civ. P. 36(a)(3).

---

[28]   For those consumers told a specific amount, more than half (51.7%) were told it would be $300,000 or more.  USF at ¶ 182.

[29]   That the survey found more than 80% of Brookstone's clients were told one of these representations establishes that they made the claim to all.  *John Beck Amazing Profits LLC*, 865 F. Supp. 2d at 1070, fn. 88 ("In the event that a valid copy test is proffered, evidence showing that 10.5% to 17.3% of copy-test respondents took away the message at issue is sufficient to prove the complaint allegation that the challenged representation has been made.") (citing *In re Telebrands Corp.*, 140 FTC 278, 325 (2005)).

Although the retainer agreement contains a buried disclaimer, that language is legally irrelevant. The disclaimer, stating that no results are guaranteed, is just one part of a 10-page, legalese contract and contradicts defendants' express sales claims. When consumers noticed it, they were told it was meaningless and did not change the promised recovery. The law holds that such disclaimers are immaterial at summary judgment. *Resort Car Rental v. FTC*, 518 F.2d 962 (9th Cir. 1975) ("The Federal Trade Act is violated if [the advertising] induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract."); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (disclaimers in contract consumers received after initial sales pitch were not sufficient to defeat summary judgment), *aff'd*, 265 F.3d 944 (9th Cir. 2001).[30]

### 4. Count IV: The Corporate Defendants Failed to Make Legally Required Disclosures.

As MARS providers, the Corporate Defendants were required to make certain written disclosures to each consumer. *See* 12 C.F.R. § 1015.4. These required disclosures include that the MARS provider cannot guarantee results, must use specific language and type font to insure that the disclaimer is prominent, and state the MARS provider cannot take advance fees. The Corporate Defendants, of course, failed to provide any of the disclosures, as shown by the marketing detailed above.

---

[30]   *See also FTC v. Medlab, Inc.*, 615 F. Supp. 2d 1068, 1077 (N.D. Cal. 2009) ("Defendants' attempts to create a factual dispute in this issue are unavailing. . . . Defendants cannot inoculate themselves from the representations that appear in the body of the text by including these cautionary statements at the foot of the advertisements."); *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (holding that fine print disclaimers that contradicted express claims were ineffective).

31

**B.   Foti and Marshall, as Individuals with Control, who Participated in the Acts, and Had the Requisite Knowledge, Must Be Held Liable for the Corporate Defendants' Conduct.**

Foti and Marshall are liable for both injunctive and monetary relief. Injunctive relief is appropriate if the FTC establishes a corporation's violations and then establishes that the individual "participated directly in the acts or practices *or* had authority to control them." *FTC v. Publishing Clearinghouse Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (emphasis added).  The FTC need not prove both participation and control, either will suffice. *Id.*  Nonetheless, the undisputed facts establish both.  Once injunctive liability is proven, the defendant will be held monetarily liable if the FTC establishes he has the requisite "knowledge."  The "knowledge" requirement is met by proof of "actual knowledge of material misrepresentations, . . . reckless[] indifferen[ce] to the truth or falsity of a misrepresentation, or . . . awareness of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. Grant Connect LLC*, 763 F.3d 1094, 1101-02 (9th Cir. 2014).   "The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *FTC v. Affordable Media*, 179 F.3d 1228, 1235 (9th Cir. 1999).  Importantly, it does not matter if Foti or Marshall thought the representations were true, had done due diligence, or acted on the advice of counsel.[31]  None of these are defenses to the knowledge standard. *Publishing Clearing House*, 104 F.3d at 1171 (intent to defraud not required); *Affordable Media*, 179 F.3d at 1235 (defendants' claim to have done due diligence regarding truth of claims does not defeat "knowledge"); *FTC v. Cyberspace.com LLC*, 453

---

[31]      Furthermore, as explained above, Brookstone's ethics counsel found that their sales process was riddled with ethics violations.  Foti knew of this opinion, and yet Brookstone made few if any of the changes recommended by the ethics counsel.  In fact, after one piece of advice from that counsel, Foti responded:  "I think we need to keep in mind he is an ethic's attorney so he is going to always say you shouldn't do this you shouldn't do that."  USF at ¶ 255.

F.3d 1196, 1202 (9th Cir. 2006) ("'[R]eliance on advice of counsel [is] not a valid defense on the question of knowledge. . . .'") (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 575 (7th Cir. 1989)).

### 1. Foti and Marshall Are Each Liable for Injunctive Relief Because They Each Had Control.

There is no material dispute that Foti was a key control person for the Corporate Defendants. As the documents show, Foti was a manager, with various titles such as VP of Marketing and CFO. His emails show his obvious control and authority, including his input on, and distribution of, sales and marketing materials while also determining bonuses for sales people. Similarly, the paper owner of Brookstone, Torchia, declared under penalty of perjury that Foti was a manager with broad authority regarding mailers and scripts, with oversight over sales.[32] Foti was also paid like an owner. Starting in 2011, he, Torchia, and Kutzner all received the same compensation and he and Kutzner were listed as "executives" in the accountant's chart. Without Torchia's knowledge, Foti also received approximately $1.5 million in additional payments through Webstar, a company he told Torchia he did not own or control. When Torchia began facing bar troubles, Foti and Kutzner cut Torchia out of the business and arranged for two new attorneys, Broderick and Marshall, to come on board. Foti was integral in the negotiations with Marshall and Marshall testified that Foti was a principal. Although Foti has submitted declarations attempting to refute these allegations and denied them at his deposition, he provides no evidence to support these denials. Such denials cannot create a genuine issue of material fact. *Publishing Clearing House, Inc.*, 104 F.3d at 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue

---

[32] Josie Lobo, Brookstone's accountant, similarly stated that Foti was part of the Brookstone management team, which consisted solely of Foti, Torchia, and Kutzner.

of material fact."); *Dizon*, 2017 WL 1498187 at *3 ("Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of fact and defeat summary judgment.") (citing *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979)).[33]

Marshall admits he owned and was an officer of Advantis Law Group, a member of the common enterprise. In that role, he took on both Brookstone and Advantis duties, working to move the common enterprise forward into new mass joinder litigation while representing the Brookstone clients in the *Wright* litigation. Although he now claims that he was only a part of Advantis Law Group, which he says had no employees or activities, this is not true. The Brookstone/Advantis employees were his agents and he knew it. He received repeated emails from Brookstone/Advantis employees from the "advantislaw.com" address, and these communications included signature blocks claiming Advantis Law Group employment and titles. As the avowed owner and officer of Advantis Law Group, these were his agents and he is liable for their conduct even if their acts were in contradiction to any orders or direction he gave. *Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir. 1957) ( "[T]he courts take the view that the principal is bound by the acts of the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even when unauthorized."); *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1438-39 (9th Cir. 1986) (holding principal liable for sales activities of independent telemarketers who had been given actual authority to sell on behalf of

---

[33]     Indeed, Judge Staton entered summary judgment against an individual defendant like Foti in another MARS case in 2016. There, as here, the individual defendant disclaimed control, asserting he was nothing more than an independent contractor. There, as here, the individual defendant in fact had control in numerous ways, including drafting marketing. The court held that his self-serving affidavit did not create a genuine issue of material fact. *FTC v. CD Capital Investments LLC et al.*, SACV14-01033-JLS (RNB), DE 157 at 16-17 (C.D. Cal. March 1, 2016).

principal); *FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) (holding principal

liable for actions of sales person who operated under actual authority and used

sales materials provided by the principal).

Marshall's claim that he did not know about Advantis Law is not a material

fact.  First, he has presented no evidence to put this fact in dispute.  His self-

serving declarations do not affect the uncontradicted evidence that he knew of the

Advantislaw.com website, had interactions with various employees claiming to

work for Advantis generally, and signed a payment processing application for

"Advantis Law."  Marshall is also, *still*, the attorney of record in this case for

Advantis Law.  As a result, he was aware of the Advantis operations and, if his

testimony is credited, understood these operations to be those of Advantis Law

Group.

Second, even if true, Marshall's claim is not material because it has no

bearing on his liability.  It does not change his control over a member of the

common enterprise, rendering him liable for the common enterprise's activity.  *See*

*FTC v. Spectrum Resources Group, Inc.*, 107 F.3d 877 (table), 1997 WL 103406 at

*2-3 (9th Cir. March 6, 1997) (holding individuals who each owned one half of the

common enterprise jointly and severally liable for the revenues of the entire

common enterprise).  The measure of recovery is what consumers paid, not what

Marshall received.  *FTC v. Commerce Planet Inc.*, 815 F.3d 593, 600 (9th Cir.

2016).

### 2.     Even Absent Control, Each Are Liable for Injunctive Relief Because Each Participated in the Wrongful Conduct.

Separately, Foti is liable because he participated in the conduct.

Uncontroverted evidence, including Foti's own testimony, establish that he was

involved in drafting at least some of the language for the various mailers, arranging

for the mailers to be sent to consumers, providing input on the content of scripts,

distributing scripts to the sales people, monitoring sales to consumers to determine

1  bonus figures, and receiving and responding to consumer complaints.  Whatever

2  his title, this is sufficient.

3      For his part, Marshall cannot deny he appeared in the *Wright* case and, after

4  his bar suspension ended in late February 2016, provided legal assistance on other

5  Brookstone matters.  In *Wright*, he represented the Brookstone clients, and touted

6  his representation's importance to the Corporate Defendants' scheme.  On multiple

7  occasions, Marshall gave the sales staff guidance on how to interact with current

8  and potential clients, and directed Kutzner and Foti to issue marketing for

9  Advantis.

10      **3.    A Permanent Injunction Is Required To Prevent Foti and Marshall from Hurting More Consumers.**

11

12      A permanent injunction restraining Foti's and Marshall's future conduct is

13  necessary because there is "some cognizable danger of recurring violation."  *Gill*,

14  71 F. Supp. 2d at 1047 (citing *United States v. W.T. Grant*, 345 U.S. 629, 633

15  (1953)).  While Foti's conduct furthering this fraudulent scheme is sufficient, his

16  previous activities running afoul of state regulators, the FCC, and otherwise

17  working with dubious players in the debt settlement industry, are also relevant.  *Id.*

18  (such determinations "may involve the consideration of past unlawful conduct")

19  (citing *CFTC v. Co Petro Mktg. Group, Inc.*, 502 F. Supp. 806, 818 (C.D. Cal.

20  1980)).  Marshall's history of repeated attorney discipline for loan modification

21  work is also appropriately considered.  *Id.*  Where, as here, the violations were

22  "predicated upon systematic wrongdoing, rather than isolated occurrences, a court

23  should be more willing to enjoin future conduct."  *Id.*  Furthermore, their orders

24  should not be "limited to prohibiting the illegal practice in the precise form in

25  which it is found to have existed in the past. . . . [Defendants] must expect some

26  fencing in."  *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965).  The order

27  must "serve to 'close all roads to the prohibited goal, so that (the FTC's) order may

28  not be by-passed with impunity.'"  *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370

(9th Cir. 1982) (quoting *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952)).  Such

fencing-in provisions need only "bear a 'reasonable relation to the unlawful practices found to exist.'" *Id.* (quoting *Colgate-Palmolive Co.*, 380 U.S. at 394-95); *see also FTC v. Grant Connect*, 763 F.3d 1094, 1105 (9th Cir. 2014) (upholding the scope of a permanent injunction granted pursuant to a summary judgment motion).

The proposed order, therefore, includes a ban on all secured and unsecured debt relief products and services. This is necessary given Foti and Marshall's past behavior, violating the explicit and clear regulations in this industry. The proposed order also includes the provisions necessary to monitor Foti's and Marshall's activities to insure compliance. Nearly identical orders have been entered following summary judgment in similar cases, including in this district. *See, e.g., FTC v. CD Capital Investments LLC*, 2016 WL 4468549 (C.D. Cal., Aug. 22, 2016); *FTC v. Lanier Law LLC*, 2016 WL 4262273 (M.D. Fla. Aug. 12, 2016).

### 4. Foti and Marshall Are Monetarily Liable Because Each Had the Requisite Knowledge.

Foti's knowledge is indisputable. As *Affordable Media* teaches, the extent of one's involvement in the scheme alone is sufficient to show the requisite knowledge. *Affordable Media*, 179 F.3d at 1235. Foti participated in all of the various acts of the scheme, from marketing to sales to collections. Foti also had specific knowledge of the fraud. He was included on internal correspondence relating to lies in the sales process. He helped draft notices to consumers repeating those lies. He received the ethics opinion indicating Brookstone was violating numerous ethical obligations. He also received and responded to consumer complaints. Foti was also aware of Torchia's bar troubles and Kutzner's FTC and criminal history. Under established law, Foti is liable because he "had knowledge that the [company] or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *Grant Connect, LLC*, 763 F.3d at 1101 (9th Cir. 2014) (quoting *Publishing Clearing House*, 104 F.3d at

1171).  His knowledge of complaints and chargebacks is separately evidence of his "knowledge" under the liability standard.  *Grant Connect LLC*, 763 F.3d at 1101. That Foti attempted to hide his involvement, shunning official titles and operating through shell companies, is further evidence of knowledge.  *United States v. King*, 577 Fed. Appx. 701, 704 (9th Cir. 2014) (intentional concealment of identity is relevant to guilty knowledge); *United States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984) (same).  As noted above, his attempt to hide is not a defense and courts frequently find lurkers like Foti liable.  *See, e.g., FTC v. CD Capital Investments LLC et al.*, SACV14-01033-JLS (RNB), DE 157 at 16-17 (C.D. Cal. March 1, 2016) (holding similar, self-proclaimed "consultant" liable).

Marshall also has the relevant knowledge.  He became an owner and officer while well aware of Kutzner's, Broderick's, and Torchia's past.  He nonetheless moved forward, despite noting he was taking on "liability" in doing so.  *Publishing Clearing House*, 104 F.3d at 1171 (nominal president met "knowledge" standard because she knew control person was facing criminal allegations).  As with Foti, Marshall's subjective beliefs about the legality of the scheme, however incredible, are not relevant and are not defenses.

### 5.  Foti and Marshall Are Liable for the Full Amount Paid by Consumers.

In cases like this one, the Court has broad equitable authority "to grant any ancillary relief necessary to accomplish complete justice," including ordering monetary relief for restitution.  *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994).  The Commission need not prove that every consumer actually relied upon the misrepresentations to prevail.  *Stefanchik*, 559 F.3d at 929, fn.12 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989).  Rather, the FTC meets its burden by proving that the misrepresentations were widely disseminated and caused actual consumer injury.  As detailed thoroughly above, the defendants made numerous misrepresentations causing consumers to pay millions of dollars.  *See*

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-606 (9th Cir. 1993); *FTC v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1293-94 (D. Minn. 1985).  The FTC does not need to show reliance by each consumer:  "Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]."  *Figgie Int'l, Inc.*, 994 F.2d at 605 (citing *Kitco of Nev., Inc.*, 612 F. Supp. at 1293 and *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991)); *FTC v. Wilcox*, 926 F. Supp. 1091, 1105 (S.D. Fla. 1995).  Furthermore, summary judgment is appropriate even if Foti or Marshall come forward with some satisfied customers because "the existence of some satisfied customers does not constitute a defense under the FTCA."  *Stefanchik*, 559 F.3d at 929 n.12; *Figgie Int'l*, 994 F.2d at 605-06 (9th Cir. 1993).  Even if some consumers were lucky enough to get some benefit, because "[t]he fraud [was] in the selling," all consumers in this case are entitled to full refunds.  *Stefanchik*, 559 F.3d at 931; *Figgie Int'l*, 994 F.2d at 606.

The proper measure of such recovery is the full amount that consumers paid.  *Commerce Planet, Inc.*, 815 F.3d at 600.  In presenting its monetary calculations, the FTC "must show that its calculations reasonably approximated the amount of customers' net losses. . . ."  *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997).  Once the FTC does so, "the burden shifts to the defendants to show that those figures were inaccurate."  *Id.*

Here, the Corporate Defendants took $18,146,866.34 from consumers.  The monetary relief figure is based on the Corporate Defendants' bank records, and takes into account refunds and chargebacks.  Using the same bank records and methodology, there were $1,784,022.61 in gross revenues during the time period Marshall was a control person.

**III.    CONCLUSION**

Foti and Marshall defrauded consumers out of millions of dollars.  Summary judgment is appropriate and they deserve orders holding them monetarily liable for their misconduct and preventing them from engaging in similar misconduct in the future.

                              /s/  Benjamin J. Theisman
                              BENJAMIN J. THEISMAN
                              GREGORY J. MADDEN

                              Attorneys for Plaintiff
                              FEDERAL TRADE COMMISSION

Executed this 10th day of July, 2017.