1

2

3
# UNITED STATES DISTRICT COURT

4
## CENTRAL DISTRICT OF CALIFORNIA

5

6

7
Federal Trade Commission,

                Plaintiffs,

8
    v.

9
DAMIAN KUTZNER, individually and as an officer of BROOKSTONE LAW P.C. (California), BROOKSTONE LAW P.C.

10
(Nevada), ADVANTIS LAW P.C., and ADVANTIS LAW GROUP P.C.;VITO

11
TORCHIA, JR., individually and as an officer of BROOKSTONE LAW P.C. (California) and

12
BROOKSTONE LAW P.C. (Nevada); JONATHAN TARKOWSKI, individually and as

13
an officer of BROOKSTONE LAW P.C. (California) and BROOKSTONE LAW P.C.

14
(Nevada); R. GEOFFREY BRODERICK, individually and as an officer of ADVANTIS

15
LAW P.C. and ADVANTIS LAW GROUP P.C.;

16
CHARLES T. MARSHALL, individually and as an officer of ADVANTIS LAW P.C. and

17
ADVANTIS LAW GROUP P.C.; BROOKSTONE LAW P.C., d/b/a

18
BROOKSTONE LAW GROUP, a California professional corporation; BROOKSTONE LAW

19

20
P.C., d/b/a BROOKSTONE LAW GROUP, a Nevada professional corporation; ADVANTIS

21
LAW P.C., a California professional corporation; ADVANTIS LAW GROUP P.C., a California

22
professional corporation, and JEREMY FOTI, individually and as an officer of BROOKSTONE

23
LAW P.C. (California), BROOKSTONE LAW P.C. (Nevada), ADVANTIS LAW P.C., and

24
ADVANTIS LAW GROUP P.C.

25
                Defendants.

No. 8:16-cv-00999-BRO (AFMx)

**RESPONSE FROM DR. BRUCE ISAACSON TO DEFENDANT'S OBJECTIONS TO MY EXPERT REPORT OFFERED IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

26

27

28

1.      I have been retained by the Federal Trade Commission (FTC) in the above matter.  My Expert Report in this matter, which I signed on June 5, 2017, provided the results of a survey I conducted measuring the experiences of consumers who retained Brookstone Law P.C. ("Brookstone").  My survey interviewed clients who had retained Brookstone, and asked about their experience with that law firm, such as why they hired Brookstone, and what they were told they could achieve by retaining Brookstone.

2.      The Defendants in this matter have described their objections to my survey in a filing entitled, "Defendant's Objections to Expert Report Offered in Support of Plaintiff's Motion for Summary Judgment" ("Defendant's Objections").[1]  This responsive report addresses the opinions expressed in the Defendant's Objections, including topics such as the questions asked in my survey, whether my survey used double-blind research methods, the sample size and response rate for my survey, and biases allegedly resulting from the methods used in my survey.

3.      As described in this response, the Defendants' criticisms of my survey are without merit, and are not consistent with generally-accepted methods for surveys or with sources such as the "Reference Guide on Survey Research."[2]  The Defendant's Objections compare my survey in this matter with a survey discussed in *In re Autozone, Inc.*,[3] but their discussion does not recognize important differences between the two surveys.  Due to these differences, the Court's criticisms in *Autozone* do not apply to my survey.[4]

4.      Specific objections provided by the Defendants, and my responses, include the following:

    i.      Questions used in my survey:  The Objections criticized the questions asked in my survey as leading, suggestive, not open-ended, or as providing innocuous responses.  However, the survey questions directly ask about issues in dispute in this matter, use neutral phrasing, include an open-ended question, and provide

---

[1] The Defendant's Objections are dated August 7, 2017.

[2] In *Reference Manual on Scientific Evidence, Third Edition*.  Federal Judicial Center, National Research Council, 2011.  This reference was cited in Footnote 19 to my report.

[3] *In re Autozone, Inc.*, 2016 U.S. Dist. LEXIS 105746, No. 3:10-md-02159-CRB (August 10, 2016).

[4] The Defendants also make a misplaced comparison with the survey in *Duran v. U.S. Bank Nat. Ass'n*, 172 Cal. Rptr. 3d 371 (2014), which had only 21 respondents in the final database.

1   many responses that are not innocuous.  In the Objections, the Defendants

2   recommend alternative phrasing for Question 6 from my survey, which asked,

3   "What, if anything, did Brookstone Law representatives say or suggest to you

4   about what you would achieve by hiring them?"  Their recommended phrasing is

5   vague, and does not measure the issues disputed in this matter.  The Objections

6   also claim that Question 6 is not open-ended, which is incorrect.  Also, contrary to

7   the Defendant's Objections, a response of "probably" is neither vague nor

8   speculative, but simply represents a different evaluation of the chances that an

9   outcome will occur than is indicated by a response of "definitely."

10  ii.  The use of double-blind research methods:  The Defendant's Objections criticize

11  the fact that my survey mentioned the Federal Trade Commission.  The

12  Defendants' claims that all surveys use double-blind methods are incorrect,

13  particularly when revealing the survey's sponsor can provide credibility to increase

14  response rates, and is not likely to affect survey responses.  As I explained in my

15  Expert Report, my survey mentioned the FTC because otherwise respondents

16  might have been suspicious about why they were called.  Contrary to the

17  Defendant's Objections, my survey was partially blinded, because both

18  respondents and interviewers were not told of the survey's purpose, and also not

19  told that the survey was conducted for use in a litigation matter.

20  iii.  Sample size and response rate:  The Defendants argue that the sample size and

21  response rate for my survey were inadequate.  However, my survey has sufficient

22  sample size to provide reliable results with an acceptable margin of error, as shown

23  by statistical calculations in this report.  Although the Defendants claim that the

24  response rate for my survey was 5.4%, it was actually 20.6% or 29.2%, using

25  proper calculation methods.  The Defendants' response rate calculation includes

26  records that should be excluded, such as contact records that had no working

27  phone number.  Also, my Expert Report clearly described the methods for

28  contacting respondents at random.

- 2 -

iv.   <u>Other comparisons with the *Autozone* survey</u>:  The Defendants compare my survey in this matter with the survey in *Autozone*, and raise criticisms based on nonresponse, self-interest bias, and whether respondents can remember events related to the survey.  However, my survey is very different from the *Autozone* survey, and was conducted in a different context.  The rate of nonresponse in my survey is much lower than the Defendants calculated.  The chain of events that would be required to create self-interest bias in my survey is unlikely, and those events may work in favor of the Defendants.  Also, the importance and infrequency of the events asked about in the survey make it likely that respondents will remember those events.

5.      After addressing my qualifications, materials reviewed, and compensation, I will address the Defendants' arguments in more detail.


**<u>Qualifications, Materials Reviewed, and Compensation</u>**

6.      As I described in my Expert Report, over my career I have personally designed, conducted, and analyzed many hundreds of research studies, including surveys for matters involving litigation.  I have conducted surveys, and provided testimony relating to my surveys, in matters involving federal courts, the Trademark Trial and Appeal Board (TTAB), the United States Department of Justice, the United States Federal Trade Commission, the United States International Trade Commission, the National Advertising Division of the Better Business Bureau, and other venues and authorities.

7.      For purposes of this responsive report, I have reviewed the Defendant's Objections to Expert Report Offered in Support of Plaintiff's Motion for Summary Judgment, dated August 7, 2017.  I have also reviewed other materials referenced in this report.

8.      For my current activities in this matter, my time is billed at $600 per hour.

**Responses to The Defendant's Objections**

9.      This section describes my responses to the Defendant's Objections in detail.


        I.      <u>The Defendants' criticisms of the survey questions lack merit.</u>

10.     The Defendant's Objections criticized the questions asked in my survey as leading,
suggestive, not open-ended, and as merely providing innocuous responses.  However, the
questions directly ask about issues in dispute in this matter, use neutral phrasing, include an open-
ended question, and provide many responses that are not innocuous.   Also, contrary to the
Defendant's Objections, a response of "probably" is neither vague nor speculative.

11.     In their Objections, the Defendants claim that my survey asked 23 questions of
respondents, and "… all 23 are leading and suggestive."[5]  Even a casual review of the questions
asked in my survey show that this is obviously not true.  For example, Questions 1, 2, 3, 4, and 5
ask whether the respondent, or a second name listed in the contact record, ever hired a law firm
called Brookstone Law, Advantis Law, or Darcy Law.  Question 11 is an instruction that tells the
respondent how to answer questions if they have hired Brookstone Law or Advantis Law
regarding more than one mortgage.  Given that these 6 questions merely provide instructions or
ask about retaining a particular law firm, it cannot be true that all 23 questions in the main part of
the survey are leading or suggestive.

---

[5] Defendant's Objections to Expert Report Offered in Support of Plaintiff's Motion for Summary Judgment
("Defendant's Objections"), p. 3, lines 6-9.  See also p. 11, lines 1-2.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

12.     As I described in my Expert Report, the other survey questions are asked in a manner that is as non-leading and non-suggestive as possible.  For example, the question phrasing provides equal emphasis to the affirmative and the negative response options.  The order of presenting response options is rotated, so the affirmative and negative response options have an equal chance of being presented first.  Also, the survey uses filter questions to make sure that respondents were only asked questions relevant to them.  For example, Question 13 asked what the law firm's representatives said or suggested about the likelihood that the terms of the mortgage would be changed; this question was only asked of respondents who previously indicated in Question 12 that the law firm's representatives said or suggested something about the likelihood that the terms of their mortgage would be changed as a result of hiring that law firm.  Among other filter questions, Questions 7 and 8 served as filters for Question 9, Question 10 was a filter for Questions 11 through 23, Question 12 was a filter for Questions 13 through 15, and Question 14 was a filter for Question 15.  The survey included other filter questions as well.

13.     Question 6 in my survey asked, "What, if anything, did Brookstone Law representatives say or suggest to you about what you would achieve by hiring them?  If you don't know or don't remember, please say you don't know or don't remember.  Please be as specific as possible."  The Defendant's Objections discuss this question at length.  The Defendants maintain that "… question 6 is *not* open-ended."[6]  The Defendants also argue that Question 6 implies that Brookstone representatives said something to respondents about what they would achieve by hiring Brookstone, while a "… a truly open-ended question would be, 'Describe in your own words the discussions, if any, between you and Brookstone representatives."[7]

14.     The Defendants' criticisms of Question 6, as well as other questions in my survey, are without merit, and, for some criticisms, factually incorrect.  For example, despite the Defendants' claims, Question 6 is in fact open-ended.  An open-ended question is one which is answered in the respondents' own words, and this is true of Question 6.[8]

---

[6] Defendant's Objections, p. 6, line 4.

[7] Defendant's Objections, p. 6, lines 6-10.

[8] The Reference Guide (p. 391) states, "Open-ended questions require the respondent to formulate and express an answer in his or her own words…"

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

15.     The Defendants suggest alternative phrasing for Question 6, but their phrasing is vague, and does not inquire about the issues disputed in this matter.  My understanding is that the FTC alleges that the Defendants made certain statements to prospective clients to induce them to hire Brookstone.  For example, the First Amended Complaint states that the Defendants convince prospective clients "… to purchase legal services by telling them that they are likely to prevail in lawsuits against their lenders.  Often Defendants tell consumers they will receive at least $75,000 by suing their lender."[9]  In other sections, the First Amended Complaint discusses outcomes that the Defendants' representatives allegedly told prospective clients their law firm could achieve.[10]  Similarly, Declarations from prior clients describe statements allegedly made by the Defendants as those clients were deciding whether to hire the Defendants' law firm.[11]  Also, scripts describe interactions between the Defendants' representatives and potential clients, including references or implications regarding future accomplishments.[12]

16.     These documents show that this dispute involves questions regarding whether Brookstone's representatives said or suggested that prospective clients could achieve certain things if they hired Brookstone.  Question 6 is phrased to provide evidence on this issue by asking Brookstone's clients what Brookstone's representatives said or suggested that the clients would achieve by hiring Brookstone.  All survey respondents were qualified in Question 1 as having hired Brookstone.  It is reasonable to expect that they hired Brookstone to achieve something.  The phrasing of Question 6 merely asks what, if anything, they were told they would achieve if they hired Brookstone.

---

[9] First Amended Complaint for Permanent Injunction and Other Equitable Relief, p. 7, paragraph 16.

[10] For example, First Amended Complaint, pp. 8, 9, 11, 12, 13, 15, and 17.

[11] See Declarations and Exhibits Filed in Support of Plaintiff's Ex Parte Application for Temporary Restraining Order With Asset Freeze, Appointment of Temporary Receiver, Limited Expedited Discovery, and Other Equitable Relief, and Order to Show Cause Why Preliminary Injunction Should Not Issue, filed 5/31/16, including Declaration of Jesse Chapman, pp. 7, 8; Declaration of Teresa Irannejad, pp. 5, 6, 7; Declaration of Ronald Kolodziej, pp. 7, 8; Declaration of Richard Leonido, pp. 8, 10; Declaration of Michael Nava, p. 26; Declaration of Raymond Navarro, p. 9; Declaration of Mario Rios, pp. 3, 4; and Declaration of Malu Lujan, p. 6.

[12] For example, see FTC-RAD-001-0171362, 364, 370, 374, 375, and 376; Document 41-2 Page ID # 2521, 2523, 2526, 2529 and 2532; FTC-RAD-001-0039885, 9958, 9889, and 9890; FTC-RAD-001-0089958; FTC-RAD-001-0108052, 8057, and 8058; FTC-RAD-002-0133018 and 3019; FTC-RAD-002-0133023 and 3025; FTC-RAD-002-0135922; and FTC-RAD-002-0233901.

17.     The alternative phrasing recommended by the Defendants is not sufficiently specific to answer the question of what respondents were told they could achieve by hiring Brookstone. The Defendants' phrasing would ask, "Please describe what was said in your communications with Brookstone representatives." A respondent answering the question as phrased by the Defendants could answer about any aspect of those communications, including the topic (such as how to find Brookstone's offices), the tone (such as whether Brookstone's representatives were polite and friendly), the frequency (such as whether they occurred daily, weekly, or monthly), the mode (such as whether they occurred in person, by phone, or by email), or many other aspects. The alternative phrasing recommended by the Defendants does not provide data that answers the question involved in this dispute.

18.     In addition to the criticisms mentioned previously, the Defendants also argue that Question 6, as well as other questions in my survey, are compound because they reference both "say" and "suggest." Also, the Defendants argue that my report is vague, in part because it references response options that were answered as "definite," as well as "probable."[13]

19.     The phrasing "say" and "suggest" is appropriate because it incorporates concepts that are explicitly communicated (which someone may "say") and concepts that are communicated in an implicit or implied manner (which someone may "suggest"). Neither of these words are vague, and they are both used in the survey because they address related but different concepts. Surveys that I and others have conducted to measure communications routinely use similar constructions, with the specific phrasing adapted for the particular context of the survey.[14]

20.     The Objections also argue that my report should not have referenced "definitely or probably" responses, because a "probably" response is "vague and borders on speculative."[15] My

---

[13] Defendant's Objections, p. 10, lines 12-25.

[14] For example, a false advertising survey I conducted used the phrase "communicated or implied." (*Church & Dwight v. SPD Swiss Precision Diagnostics*, 14-CV-585 (AJN), U.S. District Court, Southern District of New York, 2015). Other surveys I did not conduct used similar constructions, with phrases such as "imply or state," (*Sanderson Farms*, 547 F. Supp. 2d at 500-01), or "say or suggest" (Manoj Hastak and Dennis Murphy, "Effects of Bristol Windows Advertisement with an 'Up To' Savings Claim on Consumer Take-Away and Beliefs," Federal Trade Commission, 2012) https://www.ftc.gov/sites/default/files/documents/reports/effects-bristol-windows-advertisement-savings-claim-consumer-take-away-beliefs/120629bristolwindowsreport.pdf).

[15] Defendant's Objections, p. 10, lines 23-25.

report used the phrasing "definitely or probably" because many of the questions in my survey provided respondents with six possible responses, that included some form of "definitely would," "probably would," "might or might not," "probably would not," "definitely would not," and "don't know or don't remember." The exact phrasing of these responses was altered to match the construction of each question.

21.     Contrary to the Defendant's Objections, a response of "probably" is neither vague nor speculative, but simply represents a different evaluation of the chances that an outcome will occur than is indicated by a response of "definitely."  Respondents who felt that any assessment of the chances that an outcome will occur would be guessing or speculation were offered an option to indicate they didn't know, and were previously instructed (among other instructions) not to guess. My Expert Report provides data for the "definitely" and "probably" responses combined, and also breaks out "definitely" responses separate from "probably" responses.  If the Defendants wish to focus only on "definitely" responses, the Expert Report provides the data to do so.

22.     The Defendant's Objections also claim that some of the verbatim responses from my survey that are listed in my Expert Report are "innocuous," and that only 28% of respondents allege that they paid money to Brookstone.[16]  This objection is misleading.  All of the verbatim responses listed in my Expert Report come from Question 6.  Pages 20 through 23 of my Expert Report list some of the verbatim responses from Question 6.  When deciding whether any of these comments are indeed innocuous, it is important to remember that verbatim responses to open-ended questions like Question 6 capture a respondent's top-of-mind answers, in their own words. While some of the responses were innocuous, many were not.  As I stated in my Expert Report, some comments were worded quite strongly.

23.     Importantly, open-ended questions do not gather exhaustive or comprehensive answers to everything that the respondent knows or is thinking about a subject.  For example, Question 6 did not ask respondents if they paid any money to Brookstone, or how much money they paid. However, as shown in Table A of my Expert Report, 28.3% of respondents who provided a

---

[16] Defendant's Objections, p. 8, lines 7-8.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

1    verbatim response to Question 6 indicated that they paid Brookstone money or that Brookstone

2    charged them fees.  These respondents were asked about the things that Brookstone

3    representatives said or suggested they would achieve, not about whether they paid Brookstone, or

4    how much they paid.  Still, in response to Question 6, a number of respondents provided an

5    answer that referenced money or fees.  Given that Question 6 is open-ended, it is not correct to

6    conclude that respondents who did not mention payments or fees in response to Question 6 did

7    not pay any money to Brookstone.

8

9        II.        Criticisms of my survey for lack of double-blind methods and presence of bias are

10                   not valid.

11   24.    The Objections criticized my survey for mentioning the Federal Trade Commission, and

12   maintain that double-blind methods are required in surveys.  However, given that the survey

13   interviewed Brookstone clients, it was appropriate to mention the FTC to lend credibility to the

14   survey and raise response rates.  Despite statements in the Objections, double-blind methods are

15   not always used in surveys, and my survey was partially blinded.

16   25.    In their Objections, the Defendants criticize my survey for mentioning the Federal Trade

17   Commission.  The Defendants maintain that this violates double-blind research methods, which

18   they argue are "requisite," "requirements," and "critical… to a survey's objectivity and

19   reliability."[17]  They cite the Reference Guide on Survey Research in support of their argument,

20   and also maintain that my Expert Report acknowledges "… the importance of a double-blind

21   interviewing technique," and "… fully endorses the necessity of conducting surveys on a double-

22   blind basis."[18]

23

24

25

26

27   [17] Defendant's Objections, p. 3, lines 20-25.

28   [18] Defendant's Objections, p. 4, lines 12-13 and 18-19.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

26.     The Objections maintain that identifying the FTC as the survey's sponsor created bias among the responses, as some respondents were likely at risk, distressed homeowners.[19]  The Defendants also maintain that that interviewers were made aware of the "purpose and intended outcome of the survey."[20]

27.     The Defendants' discussion relating to double-blind research methods is incorrect in two respects:  whether double-blinding is a required element of all surveys, and whether my survey was not blinded.  This section addresses both of these issues.

28.     Double-blind research methods are not required in all surveys.  Despite the Defendants' claims, my Expert Report in this matter does not contain any statement or assertion suggesting that double-blinding is critical, important, requisite, or required in this matter.  Similarly, the section of the Reference Guide cited in the Defendant's Objections[21] does not state that double-blind research is always standard practice in litigation surveys, but rather states that double-blind methods are standard practice "whenever possible."   The Reference Guide also suggests that researchers evaluate the likely biases introduced by awareness of the survey's sponsorship, such as whether the sponsor has views and expectations that are apparent.[22]  The Reference Guide goes on to state, "Nonetheless, in some surveys (e.g., some government surveys), disclosure of the survey's sponsor to respondents (and thus to interviewers) is required."

29.     As I described in my report, it was appropriate to reveal the FTC as the survey's sponsor to help establish the survey's legitimacy.  Otherwise, prospective respondents might have been suspicious about the survey and how their name was obtained.  If the FTC's allegations in this matter are true, potential respondents contacted for the survey, at some point, were contacted by the Defendants, and paid the Defendants for mortgage-related services that were not provided as promised.  Such respondents may be wary or suspicious of future telephone calls involving

---

[19] As noted in my Expert Report, none of the responses to open-ended questions referenced the FTC's litigation against Brookstone, the FTC, the federal government, any state government, or any other government agency or entity.

[20] Defendant's Objections, p. 5, lines 9-11 and 20-25.  See also p. 6, lines 2-3.

[21] Defendant's Objections, p. 4.

[22] Reference Guide on Survey Research, Third Edition, p. 411.

1    mortgage-related inquiries.  The FTC alleges that these respondents include distressed

2    homeowners at risk of foreclosure; such respondents may have been hesitant to participate in a

3    survey asking them about experiences related to their mortgage, as they may have viewed this

4    topic as sensitive, private, or in some way relating to or reflecting negatively on their self-

5    image.[23]

6    30.      Mentioning the FTC allowed the survey to demonstrate legitimacy, which likely

7    encouraged participation and increased response rates.[24]  Importantly, as I mentioned in my

8    Expert Report, the FTC was mentioned in a manner designed to avoid bias.  The survey

9    mentioned the FTC in a single instance, where the interviewer stated, "I am calling on behalf of

10    MMR Strategy Group and we are conducting a brief survey sponsored by the Federal Trade

11    Commission."  The FTC was mentioned briefly, in a neutral manner, in the same sentence that

12    mentioned MMR Strategy Group.  The interviewers did not describe the Federal Trade

13    Commission, did not explain the FTC's purpose or mission, and did not mention that the survey

14    was conducted in conjunction with litigation or with an investigation into possible false or

15    misleading practices.  (Some respondents may have known the Federal Trade Commission only

16    as a government agency, and may not have known that it investigates companies for marketplace

17    practices that may be false or misleading.)

18    31.      Despite the claims made in the Objections, double-blinding is not a required element of all

19    surveys.  In fact, as I mentioned in my Expert Report, many surveys do not use double-blind

20    methods, such as the following:

21          i.      The United States Census, conducted by the U.S. Census Bureau.[25]

---

[23] Survey respondents may be hesitant to discuss topics that they view as personal, possibly threatening, and/or involving issues of self-presentation or social desirability.  See Seymour Sudman and Norman M. Bradburn, *Response Effects in Surveys*.  Aldine Publishing Company, 1974, Chapter 2: Task Variables.

[24] Seymour Sudman, "Survey Research and Ethics," *NA - Advances in Consumer Research Volume 25*, eds. Joseph W. Alba and J. Wesley Hutchinson, Association for Consumer Research, 1998, pp. 69-71. ("If there is reason to believe that the sponsor's identity will affect people's willingness to participate in the research, then the sponsor should be identified.")  *See also*, William G. Zikmund and Barry J. Babin, *Essentials of Marketing Research*, South-Western Cengage Learning, 2012, p. 176. ("Sponsorship by well-known and prestigious organizations such as universities or government agencies may significantly improve response rates.")

[25] The 2010 Census questionnaire (https://www.census.gov/history/pdf/2010questionnaire.pdf).

ii.     The National Survey on Drug Use and Health, conducted by the U.S. Department of Health and Human Services.[26]

iii.    The National Survey of Family Growth, conducted by the Centers for Disease Control and Prevention.[27]

iv.     The Current Population Survey, conducted by the Bureau of Labor Statistics.[28]

32.     In at least one other matter, an expert report revealing the FTC as the sponsor of a survey was upheld.  In that matter, as in this matter, the survey was conducted among respondents who had purchased from the defendants, so, "… it was important to give respondents confidence that the sponsor of the survey was credible and legitimate, and to avoid any confusion or suspicion about who was sponsoring the survey.  To name no sponsor but to reveal knowledge of the product purchase would implicitly (and falsely) convey to survey respondents that the survey was sponsored by the defendants or by someone who had come by the consumers' contact information illegitimately."[29]

33.     As mentioned earlier, respondents may be hesitant to discuss sensitive topics that they feel relate to or threaten their self-image, which can include income, weight, personal finances, or other topics.  The surveys listed above reveal the name of the sponsor, at least in part, to establish legitimacy, particularly when a survey deals with a sensitive topic, such as income or health behaviors.  Similar circumstances apply to my survey in this matter.

34.     The second flaw with the Defendants' arguments about double-blind research methods is that my survey was partially blinded.  There are a number of different types of blinding in surveys.  For example, blinding can apply either to interviewers or respondents, and it can involve awareness of a survey's sponsor or a survey's purpose.

---

[26] The National Survey on Drug Use and Health, conducted by the U.S. Department of Health and Human Services (https://nsduhweb.rti.org/respweb/homepage.cfm)

[27] The National Survey of Family Growth, conducted by the Centers for Disease Control and Prevention (https://www.cdc.gov/nchs/nsfg/index.htm)

[28] The Current Population Survey, conducted by the Bureau of Labor Statistics (https://www.bls.gov/cps/)

[29] *Federal Trade Commission v. John Beck Amazing Profits*, U.S. District Court, Central District of California, Case No. CV-09-4719-JHN (CWx).  Quote from Second Declaration of Frederica Conrey, Ph.D., dated October 7, 2011, p. 4.

1    35.    In my survey, interviewers and respondents knew that the Federal Trade Commission was

2    the sponsor of the survey.  However, respondents and interviewers were blind as to the survey's

3    purpose.  The survey's introduction, and all other communications with interviewers and

4    respondents, did not communicate that the survey was conducted for use in litigation, or even that

5    there was any litigation.  The sponsor of the survey was appropriately revealed to interviewers

6    and respondents, but the purpose of the survey was blinded.

7

8         III.        Criticisms of my survey's sample size and response rate are without basis.

9    36.    In their Objections, the Defendants criticize the sample size and response rate from my

10   survey.  These criticisms are factually inaccurate and without merit.  My survey has sufficient

11   sample size to provide reliable results with an acceptable margin of error.  Although the

12   Defendants claim that the response rate for my survey was 5.4%, it was actually 20.6% or 29.2%,

13   when using an appropriate calculation method.  Also, my Expert Report clearly described the

14   methods for contacting respondents at random. The criticisms reference surveys in the *Autozone*

15   and *Duran* matters, but my survey methods, sample size, and response rate are very different than

16   the surveys conducted in those matters.

17   37.    In their Objections, the Defendants claim that my survey sample of 138 interviews is too

18   small to be reliable.[30]  This is not correct.  The key question regarding the sample size for a

19   survey is whether it provides a sufficient number of interviews so that the measures from the

20   survey are stable and reliable.  This can be evaluated using statistics to calculate the margin of

21   error associated with the measures from the survey.[31]

22

23

24

25

26   _____
     [30] Defendant's Objections, p. 7, lines 17-23.

27   [31] Because the data were gathered by "convenience sampling," the margin of error should be treated as a
     general indicator of the reliability of the survey results.  See Reference Guide on Survey Research, cited

28   earlier, pp. 382-383.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

38.     For example, Question 10 in my survey asked which, if any, of certain outcomes Brookstone Law representatives said or suggested that the respondent would achieve by hiring Brookstone.  In response, 85.5% of respondents indicated they would achieve at least one outcome.[32] The margin of error associated with 85.5%, at a sample size of 138 interviews, at the 95% level of confidence, is approximately plus or minus (+/-) 5.9%.  Similarly, Questions 9, 13, 17, 21, and 23 asked what Brookstone's representatives said or suggested about the likelihood that certain events would occur.  In response, 80.4% of respondents answered that Brookstone's representatives said or suggested that they would definitely or probably achieve at least one of five outcomes.[33]  The margin of error associated with 80.4%, at a sample size of 138 interviews, at the 95% level of confidence, is approximately +/- 6.6%.[34]

39.     In my experience, these margins of error, and margins of error for other measures from the survey, are well within the range typically expected of survey measures.  In other words, a sample size of 138 interviews is sufficiently large to provide a stable and reliable basis for analysis, and is associated in this context with an acceptable margin of error.

40.     The Defendant's Objections compare my survey to the survey in *Duran*,[35] but the comparison is misplaced.  The sample size of the *Duran* survey included only 21 respondents, and had a margin of error of +/- 43.3 percent.  The sample size for my survey is 138 respondents, much larger than the *Duran* survey.  As a result, the margin of error associated with the measures from the *Duran* survey are much larger than the margin of error associated with the measures from my survey in this matter.

---

[32] As shown in Table E of my Expert Report, the outcomes included changing the terms of their mortgage, receiving money, having their mortgage voided, and getting their property free and clear of their mortgage.

[33] As shown in Table R of my Expert Report, the events included winning their lawsuit, changing the terms of their mortgage, receiving money, having their mortgage voided, and getting their property free and clear of their mortgage.

[34] The margin of error at the 95% level of confidence is approximately (SE X 1.96).  SE is the standard error, calculated as the square root of (p X (1-p)/n).  The margin of error can be used to calculate a confidence interval, which equals the measured percentage plus or minus the margin of error.  See, for example, *Introduction to the Practice of Statistics, Sixth Edition*, by David S. Moore, George P. McCabe, and Bruce A. Craig, W.H. Freeman and Company, 2009, Chapter 8.

[35] *Duran v. U.S. Bank Nat. Ass'n*, 172 Cal. Rptr 3d 371 (2014).  The comparison is from Defendant's Objections, p. 7, lines 22-24.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

41.      The Defendant's Objections also state that "many of the survey questions were only posed to smaller sub-sets of the 138 respondents.  For example, question number 15 was asked of only 28 of the 138 respondents."[36]  That criticism ignores my survey's use of filter questions.  As described earlier, filter questions make sure respondents are only asked questions relevant to them.  Filter questions "… lay the groundwork for the substantive question by first asking the respondent if he or she has an opinion about the issue or happened to notice the feature that the interviewer is preparing to ask about."[37]  By asking a substantive question only of those respondents who provided certain responses to a preceding filter question, filter questions ensure that the substantive question is only asked of respondents who can provide an informed answer.  The use of filter questions can reduce guessing and "weed out 'yea-sayers'." [38]

42.      While the Objections criticize my survey for incorporating filter questions, the Objections provide no basis or explanation as to why filter questions are not acceptable.  Indeed, filter questions are frequently necessary in litigation surveys.

43.      For example, Question 14 in my survey asked, "Did any of the law firm's representatives say or suggest anything about how the terms of your mortgage would be changed?"[39]  The 28 respondents who answered "Yes" to Question 14 were asked Question 15, "Did any of the law firm's representatives say or suggest anything about the following types of changes to the terms of your mortgage as a result of hiring them?"[40]  The respondents who answered "No" or "I don't know or don't remember" to Question 14 were not asked Question 15 because their answer to Question 14 made Question 15 irrelevant for them.  This filtering process is not a flaw in the survey, but standard survey practice that improves the reliability of responses to properly-filtered substantive questions.

---

[36] Defendant's Objections, p. 3, lines 15-17.  In my Expert Report, I noted the low response rate for those particular questions and explained that those numbers "should be interpreted with caution given the small sample size."

[37] Reference Guide on Survey Research, Third Edition, p. 390.

[38] "Survey Evidence in False Advertising Cases," by Bruce P. Keller, in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann. American Bar Association, 2012, p. 188.

[39] See my Expert Report, paragraph 45.

[40] See my Expert Report, paragraph 45.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

44.     Even with the use of filter questions, almost all substantive questions in my survey still had substantial sample sizes.  For items numbered from Question 1 to Question 23 in my survey, which included 19 actual questions asked of respondents,[41] only 2 questions were asked of 28 respondents, compared with 15 questions asked of at least 50 respondents, and 10 questions asked of at least 80 respondents.

45.     The Objections also claim that the response rate of my survey was 5.4%.[42]  This is also incorrect.  As I stated in my Expert Report, the FTC provided me with an electronic file listing customers of Brookstone Law and/or Advantis Law.  I understand that the FTC compiled the list from records maintained by the Defendants.   After removing duplicates and records with invalid phone numbers, the list contained 2,551 records,[43] but not all of these records had valid contact information.  Because the list came from records maintained by the Defendants, the quality of the list depended on the Defendants' record keeping.

46.     Table A below shows the disposition of each name contacted from the list.  As shown in Table A, many of the records could not be reached, or were invalid for other reasons.

---

[41] The remaining four items did not ask questions of any respondent, including Question 2, Question 4, Question 5, and Question 11.

[42] Defendant's Objections, p. 7, line 22.

[43] See my Expert Report, p. 3.  A valid phone number is not necessarily the correct phone number for that respondent.

**Table A:  Disposition of Contact List**

| Disposition | Number of Records |
|---|---|
| Total Records | 2,551 |
| Non-reachable records | 1,880 |
| Non-working number | 667 |
| Answering machine | 615 |
| No answer | 189 |
| Callbacks | 177 |
| Language problem | 94 |
| Non-residential | 74 |
| Fax/modem | 42 |
| Busy | 21 |
| Maximum attempts | 1 |
| Reachable records[44] | 671 |
| Interviews terminated for not qualifying | 50 |
| Reachable records after qualification | 621 |
| Completed interviews (final sample size) | 138 |
| Completed interviews removed from the database | 58 |
| Initial refusal | 410 |
| Breakoff part way or incomplete interviews | 15 |

47.     Of 2,551 records in the initial list, 1,880 were not reachable, leaving 671 reachable records.  Of those 671 records, 50 were terminated for not qualifying for the survey, leaving 621 reachable and qualified records.  Of those, 196 completed the survey.  Respondents who were terminated, or who completed the survey, are shaded in Table A.  The remaining records include 410 who refused to participate in the survey, and 15 who began but did not complete the survey.

---

[44] Details for completed interviews removed from the database, and of terminated interviews, are provided in Exhibit 4 to my Expert Report.  As explained in Exhibit 4, respondents were terminated or removed because they had never hired, or did not know if they had hired, Brookstone or Advantis; for inattentive verbatim responses; and for responses to the control question (Q.3).

48.     There are a number of ways to properly calculate the response rate.  Using a method from the *Autozone* case cited by the Defendants, which divides usable responses by reachable records, my survey's response rate is 20.6%.[45]  An alternative method for calculating response rate divides all completed interviews by the number of reachable records after qualification; this response rate is 29.2%.[46]  These calculations do not reflect the 50 interviews in which respondents were terminated for giving non-qualifying responses.  After accounting for those interviews, the response rate of my survey would be even higher.  The Objections compare the response rate in my survey to a 3.43% to 6.0% response rate for the survey in *Autozone*.[47]  The lowest properly calculated response rate associated with my survey is more than three times that of the *Autozone* survey.[48]  In my experience, the response rate for my survey meets or exceeds expectations for a telephone survey.[49]

49.     One additional comment applies regarding the discussion of sample size.  The Defendant's Objections also claim that my report does not explain how my sample was selected using a random sampling method.[50]  On the contrary, my report explains the random sampling method in detail, in paragraph 49 and footnote 26 of my Expert Report. These two locations explain the sequence of dialing records, the number of calls made to each record, the days that calls were made, and other details.  The criticism that my report does not explain the random selection process is unsupported.

---

[45] Calculated as 138 completed interviews divided by 671 reachable records.

[46] Calculated as 138 plus 58 completed interviews divided by 671 reachable records.

[47] Defendant's Objections, p. 7, lines 17-26.

[48] If 6.0% is used as a comparison, my response rate is more than 3 times the response rate from *Autozone*.

[49] Even if my survey had a higher rate of nonresponse, the survey nonresponse rate is a highly imperfect predictor of nonresponse bias ("…while nonresponse bias clearly does occur, the nonresponse rate of a survey alone is not a very good predictor of the magnitude of the bias."  Robert M. Groves, "Nonresponse Rates and Nonresponse Bias in Household Surveys," *Public Opinion Quarterly*, Vol 70, No.5, Special Issue 2006, p. 662.

[50] Defendant's Objections, p. 7, lines 25-26.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

IV.     Comparisons to the survey in *Autozone* are not appropriate, as my survey is very different from the survey in *Autozone*.

50.     The Defendants compare my survey in this matter with the survey in *Autozone*, but the two surveys are very different, and were conducted in different contexts.  Unlike in *Autozone*, the chain of events that would be required to create self-interest bias in this context are unlikely (and those events may work in favor of the Defendants).  Also, the importance and infrequency of the events asked about in this survey make it likely that respondents will remember those events.

51.     The Defendants incorrectly argue that a number of biases have affected the survey results.

52.     For example, the Defendants argue that the results may have been affected by nonresponse bias, which the Objections describe as "… a failure to account/adjust for respondents who self-select out of the survey."[51]  As described earlier, my survey's response rate is much higher than calculated in the Objections, and my survey's nonresponse rate is much lower than calculated in the Objections.  Consequently, nonresponse bias is not a problem in my survey.

53.     The Objections also discuss "self-interest bias," which is described as a connection between potential monetary gain for the respondent, and the survey responses that respondent provides.  According to the Defendants, because respondents knew that the FTC sponsored the survey, there was a "… risk that respondents would make a connection between monetary gain and how they responded to survey questions."  The Objections suggest that "… negative answers, critical of Brookstone's conduct, could lead to an FTC action against it, potentially resulting in monetary gain to the respondents."[52]

54.     The chain of events that Defendants posit as due to self-interest bias is far-fetched and extremely unlikely.  Neither interviewers nor respondents were told the purpose of the survey, or informed that the survey was used for an FTC investigation or for any type of litigation.  The questionnaire provided no suggestion that certain types of survey responses could lead to monetary gain, and the Objections do not explain how a respondent might come to believe that answers critical of Brookstone might lead to monetary gain.  In fact, it is possible that some

---

[51] Defendant's Objections, p. 8, lines 10-12.

[52] Defendant's Objections, p. 9, lines 14-15, 23-25.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

1   respondents may not know of the FTC's roles or responsibilities, other than having a general

2   sense that the FTC is a government agency. To accept the idea of self-interest bias, one would

3   have to accept that a single mention of the Federal Trade Commission in the survey's instructions

4   has a material effect on the survey results by leading respondents to realize that there is an action,

5   causing them to assume they potentially stood to gain from the action, and to also believe that

6   they would only gain if they provided answers critical of Brookstone.

7   55.   Although the Defendants compare my survey in this matter to the survey in *Autozone*, the

8   facts were much different in that case. The survey in *Autozone* was conducted for a class action

9   matter, and the survey respondents were members of the class who were told, "Your contact

10  information was obtained as part of a class action lawsuit…. The information you provide will be

11  used in connection with this lawsuit to help resolve it."[53] Unlike the survey in *Autozone*, my

12  survey was not conducted among class members for a class action lawsuit, respondents in my

13  survey were not told about the existence of a lawsuit of which they may be beneficiaries, and

14  were also not told that their answers would be used as part of the lawsuit. The analogy between

15  my survey in this matter and the survey in *Autozone* is misplaced and inappropriate.

16  56.   The Defendants also maintain that another *Autozone* factor applies to my survey, positing

17  that the events that are the subject of my survey "… occurred far enough in the past that the

18  responses were unreliable…"[54]

19  57.   Once again, the analogy is misplaced. The decision in *Autozone* asked about events that

20  had occurred between 3 ½ and 11 years ago, and might be difficult for some respondents to

21  remember, because they involved the specific length of their work shifts and the number of breaks

22  they took. The court noted inconsistencies in respondents' answers on these questions that

23  appeared to be due to the difficulty inherent in remembering "… specific information they would

24  have no way of recalling,"[55] such as relatively small differences in shift lengths.

25

26  ───────────────

    [53] *In re Autozone, Inc.*, p. 41, lines 6-9.

27  [54] Defendant's Objections, p. 10, lines 8-9.

28  [55] *In re Autozone, Inc.*, p. 42, lines 5-6.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

58.      My survey was quite different.  Based on the First Amended Complaint, I understand that the Defendants have marketed mortgage relief services since 2011,[56] so the furthest back a respondent in my survey might be asked to recall is 6 years.  Unlike the events in *Autozone*, which involved shift lengths calculated over a relatively long period of time, my survey asked about hiring Brookstone, an event that, for most respondents was likely to occur only once.

59.      Also, for most respondents, hiring Brookstone was likely a major decision.  According to scripts supplied by the Defendants, respondents who hired Brookstone were asked to first meet in person with a Brookstone representative, at Brookstone's offices.  Respondents paid substantial sums of money, allegedly amounting to thousands of dollars, to retain Brookstone, and they retained Brookstone to address a major event, namely difficulty with a mortgage, the largest financial instrument many consumers ever obtain.

60.      Marketers typically distinguish between "low involvement" decisions and "high involvement" decisions.  High involvement decisions are those that involve greater consequences, such as the purchase of medical care, education, a home, or legal services such as Brookstone's services.  They can be contrasted with low involvement decisions, such as the decision about whether to buy a pack of gum on impulse at a drug store.  If the consumer selects the wrong pack of gum, the consequence is much lower than if the consumer selects the wrong doctor, the wrong medical procedure, the wrong school, or the wrong lawyer.  (Consequences may be financial or may involve other issues, such as health or career.)

61.      When faced with high involvement decisions, such as the decision whether or not to retain Brookstone, consumers are likely to give the decision more thought and are more likely to remember the decision.[57]  It is reasonable to expect that respondents will remember their experience with hiring Brookstone sufficiently well to answer survey questions about it, particularly when the experience likely occurred only once, involved an important topic (financial difficulty with a mortgage), and likely required them to visit Brookstone's offices in person.

---

[56] First Amended Complaint, p. 7, line 19.

[57] Wayne D. Hoyer, and Deborah J. MacInnis, *Consumer Behavior*.  South-Western/Cengage Learning, page 178.  *See also*, Jay Lindquist and M. Joseph Sirgy, *Shopper, Buyer, and Consumer Behavior: Theory, Marketing Applications, and Public Policy Implications*. Cengage Learning, 2009, p. 231.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

62.     Despite the likelihood that respondents remembered their interaction with Brookstone sufficiently well to answer survey questions, the risk of forgetting is also mitigated because my survey questionnaire offered respondents the opportunity to indicate that they could not remember.  All substantive survey questions included a response option labelled, "I don't know or don't remember."  Also, survey instructions told respondents that they should not guess, and should indicate that they don't know or don't remember if they don't know how to answer or don't remember.

**Conclusions**

63.     In conclusion, I believe that the criticisms of my survey raised by the Defendant's Objections are without merit, based on misguided comparisons with other surveys, and in some cases factually incorrect.  My response to specific criticisms can be summarized as follows.

      i.    The Objections criticized the questions asked in my survey as leading, suggestive, not open-ended, or as merely providing innocuous responses.  However, the questions directly ask about issues in dispute in this matter, use neutral phrasing, include an open-ended question, and provide many responses that are not innocuous.   Also, contrary to the Defendant's Objections, a response of "probably" is neither vague nor speculative, but simply represents a different evaluation of the chances that an outcome will occur than is indicated by a response of "definitely."

     ii.    The Objections criticized my survey for mentioning the Federal Trade Commission, and maintain that double-blind methods are required in surveys.  Given that the survey interviewed Brookstone clients who had allegedly been deceived regarding their choice of legal representation, it was appropriate to mention the FTC to lend the survey credibility and raise response rates.  Double-blind methods are not always used in surveys, and my survey was partially blinded.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

iii.   The Defendants argue that the sample size and response rate for my survey were inadequate.  However, my survey has sufficient sample size to provide reliable results with an acceptable margin of error.  Although the Defendants claim that the response rate for my survey was 5.4%, it was actually 20.6% or 29.2%, using proper calculation methods.  Also, my Expert Report clearly described the methods for contacting respondents at random.

iv.   The Defendants compare my survey in this matter with the survey in *Autozone*, citing issues such as self-interest bias and the possibility of forgetting events, but the two surveys are very different, and were conducted in different contexts.  The chain of events that would be required to create self-interest bias are unlikely, and those events may work in favor of the Defendants.  Also, the importance and infrequency of the events asked about in the survey make it likely that respondents will remember those events.

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)

1   I declare under penalty of perjury under the laws of the United States that the foregoing is true and

2   correct to the best of my belief.

3

4   Executed in Encino, California, on August 14, 2017.

5

6

7

8                                                    Dr. Bruce Isaacson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Responsive Report of Dr. Bruce Isaacson
No. 8:16-cv-00999-BRO (AFMx)